741 A.2d 1143

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Robert J. SHERIDAN.**

**Misc. Docket (Subtitle AG) No. 16, Sept. Term, 1998.**

Court of Appeals of Maryland.

Dec. 10, 1999.

2

4

**6**

Melvin Hirshman, Bar Counsel and John C. Broderick, Asst. Bar Counsel, for the Atty. Grievance Com'n of Maryland, Petitioner.

Robert J. Sheridan, College Park, for Respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, RAKER, WILNER, CATHELL and HARRELL, JJ.

HARRELL, Judge.

Pursuant to Maryland Rule 16–709(a),[1] Bar Counsel, on behalf of the Attorney Grievance Commission (AGC), Petitioner, and at the direction of the Review Board, filed a petition with this Court for disciplinary action against Robert J. Sheridan, Esquire, Respondent. In the petition, Bar Counsel alleged violations of Rules 1.15(a), (b), and (c), and Rule 8.4(c) of the Rules of Professional Conduct (RPC) and Maryland Code (1992, 1998 Rep. Vol.), Business Occupations and Professions Article (BOP) § 10–306. This Court referred the matter to

---

1. Rule 16–709(a) states that: "[c]harges against an attorney shall be filed by the Bar Counsel acting at the direction of the Review Board."

Judge Theresa A. Nolan of the Circuit Court for Prince George's County to conduct an evidentiary hearing and make findings of fact and conclusions of law in accordance with Maryland Rules 16–709(b) and 16–711(a).[2] After an evidentiary hearing, Judge Nolan found by clear and convincing evidence that Respondent violated RPC Rules 1.15(a), (b), and (c), RPC Rule 8.4(c) and BOP § 10–306. Respondent filed with us extensive exceptions to the findings of fact and conclusions of law made by Judge Nolan.

From the evidentiary record made below, Judge Nolan made the following findings of fact:

1. Robert J. Sheridan, (hereinafter "Respondent") was admitted to practice law in the State of Maryland on November 16, 1978.

2. In January 1991, Respondent entered into negotiations with I.H. Hershner Company, Inc. (hereinafter "Hershner") a Pennsylvania corporation. Respondent was employed by Hershner to collect upon debts owed to Hershner. Hershner assigned Respondent six debts, one of which was a debt owed to Hershner by RDP Enterprises (hereinafter "Perry"), a business whose offices were located in Maryland.

3. There is some disagreement between the Attorney Grievance Commission (hereinafter "Petitioner") and Respondent over the fee arrangement between Hershner and Respondent. Respondent claims that there was a retainer agreement which set out the fee arrangement. Such agreement provided that Respondent would be paid $150 an hour or on a percentage basis. The Court studied this agreement and noted that although it bore the signature of Barry V. Bishop, the president of Hershner, Respondent's signature did not appear on the agreement. Further, there was

---

2. Rule 16–709(b) states that the "Court of Appeals by order may direct that the charges be transmitted to and heard in any court and shall designate the judge or judges to hear the charges and the clerk responsible for maintaining the record in the proceeding."

Rule 16–711(a) states that a "written statement of the findings of facts and conclusions of law shall be filed in the record of the proceedings and copies sent to all parties."

no date on the contract and numerous provisions were crossed out by Mr. Bishop. Mr. Bishop has also initialed all of these provisions.

4. The Court also noted that the provisions were initialed by Respondent. However, his handwritten notes appeared next to the provisions. This suggests to the Court that Respondent did not agree to Mr. Bishop's alterations to the provisions.

5. On March 19, 1991, Hershner filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Middle District of Pennsylvania. Despite this proceeding, Respondent continued to collect on Hershner's accounts.

6. On June 12, 1991, Markian Slobodian, Hershner's counsel for the bankruptcy proceeding, sent a letter to Respondent informing him of Hershner's bankruptcy. Mr. Slobodian advised Respondent that he could become Special Counsel to Hershner in the bankruptcy proceeding if Respondent filled out the accompanying application. Respondent failed to do so.

7. On January 31, 1992, an Order of Settlement was entered in Fairfax County, Virginia on behalf of the Hershner and Perry account. As part of the settlement, Hershner received $9,161.40, interest in the amount of $1,035.58, and attorney fees in the amount of $1,832.28. Perry was ordered to pay these amounts in twenty one installments of $450.00 each. The checks were to be payable to "Robert J. Sheridan, Attorney for I.H. Hershner Co."

8. Pursuant to the settlement and prior negotiations, Respondent received two checks for $450.00 and deposited them into his escrow account. He did not notify Hershner regarding the settlement or the receipt of the funds. It was disclosed that these funds were withdrawn from the escrow account on a later date and used for professional and personal services.

9. Following the Perry settlement, Mr. Slobodian sent Respondent another letter concerning Hershner's bankrupt-

cy status. This letter informed Respondent that because he did not sign the application to be appointed as Special Counsel for Hershner, Respondent was no longer authorized to represent Hershner. Hershner then requested the return of all files and ordered Respondent to cease any further legal action on behalf of Hershner. Instead, Hershner would seek to retain alternate counsel to proceed with any pending litigation. At this time, Hershner was unaware that a settlement had been reached in the Perry case.

10. Despite this letter dated May 13, 1992, Respondent received another letter on June 10, 1992 advising Respondent that he could sign a stipulation of dismissal on behalf of Hershner in the case of *Hershner v. Vitellaro,* Case No. 91–CG–1779 937208. This letter however, did not advise Respondent to act on any of the other accounts for Hershner.

11. Some time later, Hershner learned about the Settlement Order in Fairfax County between Hershner and Perry. Rodger Troupe, the administrative manager for Hershner, sent Respondent a letter confirming Hershner's knowledge about the existence of a Settlement Order. Mr. Troupe informed Respondent that he also had knowledge Respondent had received money from Perry. Mr. Troupe requested this money to be forwarded to him at Hershner. Despite this request, Respondent failed to forward the funds.

12. At the Court proceeding, Respondent testified that Mr. Troupe had not requested the funds. Instead, he asserted that Mr. Troupe instructed him to retain the money because Hershner owed Respondent outstanding legal fees. Following this correspondence, there was no action taken by either party.

13. Approximately two years later, on March 2, 1994, Allied Products, Inc. (hereinafter "Allied") and Hershner entered into an Asset Purchase Agreement. As part of the Agreement, Allied would buy substantially all of Hershner's assets including any receivables that were written off and had no value. There was no mention of any security

interest held by Respondent. This agreement was approved by the Bankruptcy Court on March 14, 1994.

14. On March 7, 1995, Respondent sent a letter to Perry inquiring about the payments still owed to Hershner as part of the January 1992 Order of Settlement. Respondent ordered Perry to pay him $450.00 a month. Respondent further explained that he had put the Hershner file on hold when Hershner had filed for bankruptcy. Because the bankruptcy case was dismissed on November 4, 1994, he felt he was free to pursue the case. Respondent then threatened to file a Request for Foreign Judgment in Charles County, Maryland if Perry did not comply with his demands.

15. Following the March 7, 1995 letter, Perry received a subsequent letter from Respondent. This letter stated that Respondent wanted "in his hands" no later than October 25, 1995, $16,733.74 due to Hershner. Respondent ordered that this check be payable to "Robert J. Sheridan, Attorney for I.H. Hershner Co." Checks were then issued to Respondent. A check was dated for March 20, 1995, May 11, 1995, and July 6, 1995; all in the amount of $450.00. A subsequent check in the amount of $900 was received on August 9, 1995. None of these checks were put in an escrow account for Hershner or a separate account for clients' funds. Moreover, Respondent admitted that the funds were used on professional and personal expenditures.

16. Hershner or Allied was [sic] not notified about the funds. Respondent testified that he did not inform Hershner because he was unaware of Hershner's existence and as a result, believed that there was no client to inform him [sic].

17. On October 27, 1995, Perry faxed a copy of Respondent's letter and attachments to Allied in order to inform Allied of Respondent's conduct. Perry had become concerned that Allied was not receiving the funds. True to Perry's belief, Allied had been unaware of any receipt of funds for the Perry receivable.

18. Respondent's conduct then intensified. On October 29, 1995, Respondent sent a final letter to Perry suggesting a modification of the original financial arrangement. Specifically, Respondent stated that Hershner and he would be willing to accept $12,000 payable in three equal installments "in [Respondent's] hands."

19. Interaction between Allied and Respondent occurred early November 1995, when Respondent sent a letter to Allied informing the company of how he felt he was treated unfairly by Hershner. Respondent justified his retainer of the funds on the grounds that Hershner had abandoned all legal claims to the money. Because Hershner owed Respondent attorney's fees and because Respondent had been awarded attorneys' fees, Respondent had a lien on the proceeds. He did not inform Hershner of the money because he was unaware of their existence and because he felt that no [sic] money was owed to him. Moreover, he argued that the retainer agreement clarified his ownership interest in the money.

20. Allied responded to Respondent's letter and explained that Allied had purchased Hershner's assets free and clear of all liens. As a result, the collections received by Respondent were Allied's property. Respondent was ordered to give a full accounting of the collectibles since March 1994 and to cease making any further collections. Respondent failed to deliver a full accounting or return any of the collectibles.

21. In response to Respondent's lien theory, Allied attacked Respondent's arguments. First, Allied argued that there is no evidence the retainer agreement was ever entered into. Further, if there was a retainer agreement, it would not confer rights onto Respondent to retain any payments by Perry, absent a judicial determination.

22. Second, Allied asserts that the Bankruptcy Court's approval of the sale of assets by Allied freed Allied of any liens, security interests, and encumbrances on Hershner's assets. Thus, the Bankruptcy Court would have discharged any lien Respondent had.

23. Despite the arguments advanced by Allied, Respondent refused to return the money to Allied. Such inaction prompted Allied to make an offer of settlement. Allied would be willing to accept an immediate cash payment of two thirds the amount of the Perry account balance. Because the account was for $9,687.43, the net would be $6,458.29. In addition, Respondent would retain the $3,600.00 already collected and Allied would assign Respondent the receivable including the judgment Hershner obtained. Respondent did not accept this offer, nor did Respondent return any of the money. Further, Respondent did not seek judicial assistance or advice from the Maryland Bar Association. As a result, the Court believes that attorney misconduct occurred.

24. The Court observed that Respondent truly believed that the money was legally his. Further, the Court believes that Respondent's actions were not motivated by any decision to intentionally defraud Allied or Hershner. Respondent's decision to retain the funds however, defrauded Allied and/ or Hershner of its legal claim to the settlement money.

Based upon the aforementioned findings of fact, Judge Nolan concluded that the Respondent violated the following:

1. **Rules of Professional Conduct, Rule 1.15—Safekeeping Property.**

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this

Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

**2. Business Occupations and Professions Article § 10–306 of the Annotated Maryland Code**

*Misuse of Trust Money:* A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer.

**3. Rules of Professional Conduct, Rule 8.4(c)—Misconduct**

It is professional misconduct for a lawyer to:

(d) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

Respondent's exceptions launch *ad hominem* assaults on Judge Nolan, her conduct during the hearing, and the authorship of her written findings and conclusions, as well as asserting a lack of clear and convincing evidence in the record to support Judge Nolan's conclusion that Respondent acted unethically. We address Respondent's exceptions below.

## I.

Throughout his exceptions, Respondent describes a virtual witch hunt against him aided and abetted by Judge Nolan. He essentially alleges that the conduct of the hearing and Judge Nolan's findings were tainted by her pre-determined conclusion that Respondent violated his ethical duties and "general" prejudice against him. As a result of such prejudice, Respondent also believes that Judge Nolan denied him

his due process rights. For example, in paragraph 2 of Respondent's Exceptions, he states:

> Ordinarily the defects at the [Inquiry] Panel and [Review] Board levels are rectified by a full and fair trial before an impartial Circuit Court judge, but such was not the case in these proceedings. The trial court's pre-disposition or pre-determination of Respondent's guilt was presumably caused in substantial part by the AGC's unlawfully including in the Petition charges of criminal violations that had been filed with the Inquiry Panel, that were found by the Inquiry Panel (despite the members being hand-picked Allied cronies or puppets) to be groundless, that were specifically dismissed by the Panel, and which were not part of the charges the Review Board authorized the AGC to file. It is one thing for the AGC to include charges not previously before the Panel or Board, but possibly related to the factual allegations. It is quite another to file with the Court charges that were specifically dismissed by the Panel as groundless, leave those charges pending throughout the trial, and then, during final argument, admit the lack of evidence and voluntarily dismiss, and pretend that the charges did not seriously affect the conduct of the trial and the outcome. The trial court's predisposition and predetermination of guilt and general prejudice against the [Respondent] was further demonstrated by, among other things,
>
> > a) some questionable limitations on Respondent's cross-examination of Petitioner's witnesses,
> >
> > b) repeated interruptions of Respondent's direct testimony, even while Respondent was in mid-sentence, to adversarially argue her version of the facts (as if she were present during 1991–92 events or the 1995 events) from nothing more than pure speculation,
> >
> > c) repeated interruptions of Respondent's direct testimony, even while Respondent was in mid-sentence, to argue her incredibly erroneous positions on the law[.]

Moreover, Respondent bootstraps his claim of judicial prejudice, in part, upon his unsubstantiated theory that, after the hearing, the judge simply handed the matter to her law clerk

to draft findings and conclusions that Respondent committed ethical violations. He asserts that:

> Judge Nolan completely ignored the clear and undisputed facts, admitted to knowing nothing about bankruptcy law or the applicable lien laws or the attorney ownership of fee assessment laws, and simply handed the matter to her law clerk to find Respondent guilty and write up some miscellan[e]ous dates and "facts" to make Respondent look guilty.

His exceptions are replete with similar accusations. For example, in excepting to paragraph 7 of the trial court's findings of fact, Respondent writes:

> Paragraph 7 further demonstrates the trial judge's (or her clerk's) complete lack of any grasp of the applicable legal terms and concepts in this case. The Order was not entered "on behalf of the Hershner and Perry account", and it is woefully inaccurate and legally illiterate to use the term "received", followed by dollar amounts, to describe any settlement or judgment. If, for example, in a court case such amounts are paid in a lump sum with a contemporaneous dismissal, then perhaps it can be said that the plaintiff "received" specified dollar amounts. Similarly, the trial judge (or her clerk) apparently cannot grasp the concept of a consent judgment, which is an agreement of the parties as to what is owed, and a court approval of that amount (law judgments of any kind being nothing more than judicial declarations of what is owed, with the judgment collection (voluntarily or by execution) to be left to future events and determination). Again, Paragraph 7 is a clear demonstration of the complete lack of due process, which presumably requires a knowledgeable and attentive fact-finder with complete impartiality and grasp of applicable law, terms and legal concepts, not a pre-decided "fact"-finder instructing a totally unknowledgeable law clerk to whip up something that makes the Respondent look guilty.

Respondent's allegations ring hollow.

■ We have reviewed the record before us and find Respondent's allegations regarding Judge Nolan to be baseless. The transcript belies Respondent's allegations of judicial prej-

udice and clearly shows that Judge Nolan afforded Respondent ample opportunity to present his case. She did not demonstrate, as Respondent alleges, her prejudice against Respondent by imposing "some questionable limitations on Respondent's cross-examination of Petitioner's witnesses," nor did she unjustifiably interrupt Respondent's direct testimony. To the contrary, her active participation during the hearing served only to sharpen the issues and efficiently confine the proceedings to relevant matters. During cross-examination, Respondent resisted answering questions. When Respondent had the opportunity to cross-examine Petitioner's witnesses, he often made argumentative statements rather than asking proper questions. The judge's restrictions on Respondent's comments throughout the hearing lay well within her discretion and the spirit of the Maryland Rules of Judicial Conduct. If Respondent felt restricted in the presentation of his case, the blame lies squarely on him for failing to respond to questions when asked or for failing to take advantage properly of the opportunities afforded him by Judge Nolan. The judge's conduct in this case did not deprive Respondent of a fair hearing. We overrule any exceptions pertaining to accusations of judicial prejudice.

Respondent has pointed to not one shred of credible evidence to support his claim that Judge Nolan referred this case to her law clerk to "paper" a pre-ordained decision to hold him accountable in this matter. Furthermore, Respondent's focus on whether Judge Nolan's law clerk drafted the findings of fact and conclusions of law, even if true, is of no moment in these disciplinary proceedings. We reject any notion that the delegation of drafting findings of fact and conclusions of law to a judge's clerk, for the judge's review and adoption, lies outside the realm of a judicial clerk's duties or the proper administration of the judicial process. Judicial clerks are integral to the judicial process. *See Gill v. Ripley,* 352 Md. 754, 773, 724 A.2d 88, 98 (1999). Their work is "entirely judicial in nature and is 'supervised, approved, and adopted by the judges who initially authorized it.'" *Gill,* 352 Md. at 772, 724 A.2d at 97 (citations omitted). Judge Nolan's

adoption of the findings of fact and conclusions of law, evidenced by her signature, cast them as her product, as if (and for all we know it was) penned originally by her hand from their inception. Whether her judicial clerk drafted the findings of facts and conclusions of law, or whether the judge herself drafted them, has no bearing on Respondent's case.

## II.

We now turn our review to the content and sufficiency of the findings of fact and conclusions of law made by the trial court. In doing so, we note that this Court has original jurisdiction over all attorney disciplinary proceedings. *See Attorney Griev. Comm'n v. Glenn,* 341 Md. 448, 470, 671 A.2d 463, 473 (1996). The responsibility to make final determinations of an attorney's alleged misconduct is reserved to us. *See* Md. Rule 16–709; *Glenn,* 341 Md. at 470, 671 A.2d at 473. As to disputed findings of fact made by Judge Nolan, " 'we [make] an independent, detailed review of the complete record with particular reference to the evidence relat[ed] to the disputed factual finding.' " *Glenn,* 341 Md. at 470, 671 A.2d at 473 (citing *Bar Ass'n v. Marshall,* 269 Md. 510, 516, 307 A.2d 677, 680–81 (1973)). In reviewing the record, however, this Court adheres to the fundamental principle that the factual findings of the assigned judge in an attorney disciplinary proceeding "are *prima facie* correct and will not be disturbed on review unless clearly erroneous." *Id. See also Attorney Griev. Comm'n v. Kemp,* 303 Md. 664, 674, 496 A.2d 672, 677 (1985); *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 679, 431 A.2d 1336, 1350 (1981). This means that we will not tamper with the factual findings if they are grounded on clear and convincing evidence. *See Kahn,* 290 Md. at 654, 431 A.2d at 1350. We also keep in mind that it is elementary that the judge "may elect to pick and choose which evidence to rely upon." *Kemp,* 303 Md. at 675, 496 A.2d at 677. Such deference is paid, in part, because she is in the best position to assess first hand a witness's credibility. *See Glenn,* 341 Md. at 470, 671 A.2d at 474. We add, however, that "an attorney in a disciplinary proceeding need only establish factual matters in defense of an attorney's position by the preponderance

of evidence, including whether mitigating circumstances existed at the time of the alleged misconduct." *Attorney Griev. Comm'n v. Powell,* 328 Md. 276, 288, 614 A.2d 102, 108 (1992).

### *Violation of RPC Rule 1.15*

We have reviewed extensively the record and conclude that Judge Nolan's findings of fact as they pertain to Rules 1.15(a), (b), and (c) are supported by clear and convincing evidence. To the extent that Respondent disputes her findings of fact, we overrule those exceptions on the grounds they are either irrelevant, argumentative, or unsupported by a preponderance of the evidence. It is undisputed that Respondent and Hershner formed an attorney-client relationship in early 1991. Hershner employed Respondent's legal services for collection efforts against various debtors owing monies to Hershner. From the inception of this relationship, Respondent owed an ethical duty to his client under Rule 1.15.

Rule 1.15(a) requires that:

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

Respondent failed to keep separate the collected funds. In 1991 and 1992, Respondent received two settlement checks of $450 each from Perry. Respondent deposited the checks in his escrow account, but later withdrew them and applied the money for his own professional or personal use. In 1995, without directions from or the knowledge of his client, Respondent demanded payments in arrears from Perry as evinced by his dunning letter dated 7 March 1995.[3] Respon-

---

3. In the record, there are three checks from Perry to Respondent, each for $450, dated 20 March 1995, 11 May 1995, and 6 July 1995,

dent received payments from Perry, but did not deposit the funds in escrow and instead used them for business and professional purposes. These examples provide clear and convincing evidence that Respondent violated Rule 1.15(a).

Rule 1.15(b) states that:

Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

Respondent did not notify Hershner of funds received from Perry in 1991 or 1992; in fact, he did not notify his client about the settlement he reached with Perry. In 1995, Respondent received a series of payments from Perry and, again, he failed to notify Hershner or its successor, Allied, of the payments received. Also in November 1995, after discovering that Respondent had collected monies from Perry without notifying it, Allied demanded a full accounting of the amounts collected by Respondent since March 1994. Respondent did not provide an accounting. His failure to notify Hershner in 1991 or 1992 and Allied in 1995, and to provide an accounting as demanded by Allied, provides clear and convincing evidence that Respondent violated Rule 1.15(b).

Rule 1.15(c) provides that:

When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respec-

---

respectively; all are indorsed on the back and deposited by Respondent. Another check from Perry to Respondent for $900, dated 9 August 1995, was also made payable to Respondent and endorsed and deposited by him.

tive interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

Disputes over the ownership of funds collected by Respondent in the Perry case arose in 1992 and 1995. In a letter dated 23 June 1992, after discovering Perry made payments to Respondent, Hershner demanded the payments be forward. Respondent failed to forward the funds or keep the funds separate until the dispute was resolved. In 1995, another dispute arose, this time between Respondent and Hershner's successor, Allied. Respondent failed to keep the funds separate until the dispute was resolved. These facts provide clear and convincing evidence that Respondent violated Rule 1.15(c).

Respondent conceded during oral argument before us that his 1992 conduct was problematic. Based on such a concession, he indicated that, by his standards, an appropriate sanction for that conduct alone would be a reprimand or up to a 60–to–90 day suspension. As to his conduct in 1995, Respondent argues that he is blameless. He claims that he did not know of the bankruptcy status of Hershner or of Allied's existence as Hershner's assignee of its assets and claims until Allied contacted him later in November 1995 and cannot be culpable for any of his 1995 actions until that point. We cannot accept any of Respondent's suggestions that he is somehow immunized from his ethical duties under Rule 1.15 because he lacked knowledge of the existence of Allied. This Court has explained that with regard to Rule 1.15 "an unintentional violation of this rule . . . is still a violation of the attorney's affirmative duties imposed by the rule." *Glenn,* 341 Md. at 472, 671 A.2d at 475. *See also Attorney Griev. Comm'n v. Adams,* 349 Md. 86, 96, 706 A.2d 1080, 1085 (1998).

Respondent also argues that no attorney-client relationship existed between himself and Allied and, therefore, he owed no duty to it under Rule 1.15 for his 1995 conduct. In paragraph 86 of his exceptions Respondent states:

It is inconceivable that Allied could claim third party protected status vis-a-vis Respondent (when there was no client

instruction with regard to Allied, when there was no knowledge of Allied's existence, let alone its identity, and where the very transaction on which its status would be based is null and void with regard to this Respondent, due to the total lack of proper bankruptcy notice), or claim potential harm by Respondent, when it made no effect to contact Respondent or Mr. Perry, no effort to collect anything from Mr. Perry, and would clearly never have contacted Mr. Perry or the Respondent. Clearly Allied had no real interest in the Perry receivable, and clearly Allied is not the type of third person contemplated in the rules and statutes as being the subject of the protections the rules and statutes afford. Similarly, the rules and statutes presuppose the attorney's knowledge the attorney's knowledge of the existence of a client and the existence of a third person, neither element being present in this case, at least as to the 1995 events. *And, again, had Respondent been even slightly aware of Allied's existence, he obviously would have contacted Allied, attempted arrangements to continue pursuing the Perry judgment or turned the file over to Allied,* rather than waste thousands more in overhead to more than likely receive less monies, and have to put an entire legal career at risk to be able to keep even a penny of it (if one believes that Hershner never instructed [Respondent] to keep proceeds, and if one disregards [Respondent's] exclusive ownership).

(underlining by Respondent) (emphasis added by this Court). We disagree.

■ At the outset, we note that this argument ignores the fact that Respondent had a duty to provide an accounting upon request,[4] and that disputed funds must be kept separate.

---

4. Allied requested an accounting in a letter dated 5 November 1995. Respondent asserts that he never received the letter. Even if Respondent received the benefit of the doubt, he nonetheless violated his other duties under Rule 1.15(b), e.g. notifying his client or Allied about the receipt of funds. Furthermore, Rule 1.15(c) also deals with the duty to account in situations where the attorney and client or third party have disputes over funds. The Rule requires that the attorney keep disputed

Furthermore, Allied is a third party protected by Rule 1.15. This Court recognizes the "principle of law that attorneys, with notice of an assignment of settlement proceeds by their client to a third party, are obligated to protect the interests of that third party and may be held liable for failure to do so." *Roberts v. Total Health Care, Inc.,* 349 Md. 499, 519, 709 A.2d 142, 151–52 (1998). While this case does not involve issues of civil liability as were considered in *Roberts,* the principle also applies in attorney disciplinary actions. *See id.* Respondent claims he had no notice of Allied's existence. We are unconvinced that Respondent did not know, or could not have known, of Allied's relationship to Hershner at the time his collection efforts intensified in 1995. His 7 March 1995 demand letter to Perry indicates that he had some knowledge of Hershner's bankruptcy status or, with little effort, would have been able to obtain more. He states:

> Fortunately for you, I put the Hershner–Perry file on hold when Hershner filed for bankruptcy and it was prevented from paying me my legal fees and costs for pursuing its outstanding receivables. After a few years in the bankruptcy court, the bankruptcy case was dismissed on November 4, 1994, eliminating any barrier to my pursuing the Hershner cases. Upon learning of the dismissal, I have reopened the various Hershner files and intend to pursue them vigorously.

Several times during his testimony at the hearing before Judge Nolan, Respondent revealed that he made no real efforts to discern better the status of Hershner after the bankruptcy dismissal. During his opening statement at the hearing, Respondent stated:

> I checked with the bankruptcy court and was advised that the case was dismissed, the bankruptcy case of Herschner's [sic] was dismissed as if it were never filed. No effect, no nothing, nothing happened, the exact words of the clerk up there. She also advised me that she lived in York [Pennsyl-

---

funds separate until an accounting and severance of their interests. This Respondent did not do.

vania] [5], was familiar with Herschner [sic], and that Herschner [sic] was completely out of business.

During cross-examination, Judge Nolan asked Respondent if he contacted Hershner in 1995 before demanding payment from Perry. Respondent stated:

I made a phone call to Pennsylvania. I got a, a signal that the line I called was disconnected. As as I, as I said in the, in the [inquiry] panel hearing, it could very well be looking back, maybe in my haste I dialed the wrong number or something and didn't listen carefully to the recording[ ] on the other end.

Respondent did not deny, when asked by Judge Nolan, that he did not make other efforts to contact Hershner or its successor company. The record is clear that Respondent was on notice to discern the legal status of his client. In essence, Respondent did not check his facts before churning the judgment execution wheels against Perry.

### *Violations of BOP § 10–306*

In her conclusions of law, Judge Nolan found that Respondent violated § 10–306. The statute states: "A lawyer may not use trust money for any purpose other than the purpose for which the trust money is entrusted to the lawyer." We have previously held that a violation of § 10–306 requires willful conduct on the part of the attorney charged. *See Attorney Griev. Comm'n v. Adams*, 349 Md. 86, 96, 706 A.2d 1080, 1085 (1998). Willful conduct, in this context, requires proof of general intent by clear and convincing evidence. *See Adams*, 349 Md. at 98, 706 A.2d at 1085 (quoting from *Glenn*, 341 Md. at 482, 671 A.2d at 480, quoting from *McBurney v. State*, 280 Md. 21, 29, 371 A.2d 129, 134 (1977)). General intent, for these purposes, "includes those consequences which (a) represent the very purpose for which an act is done (regardless of likelihood of occurrence), or (b) are known to be

---

5. Hershner was a Pennsylvania corporation and, apparently, based in or around the area of York, PA.

substantially certain to result (regardless of desire)." *McBurney, id.*

The record is replete with evidence that Respondent willfully misused trust money for his own use. Judge Nolan found by clear and convincing evidence that Respondent received his client's monies in 1991 and 1992, that he deposited those monies in his escrow account, and later removed them for his professional and personal purposes. The judge also found that, in 1995, Respondent also received monies on behalf of Hershner that were never deposited in escrow, but were used by him for professional and personal expenditures. Furthermore, Respondent's own testimony on cross-examination is particularly telling with regard to his willful conduct. Respondent testified:

Q [Petitioner]: The two earlier payments of $450 in December of '91 and January of '92, you deposited in escrow, but you took that out, you admit that?

A [Respondent]: I deposited them in escrow and I do not know when they were taken out, but they were eventually taken out, sure.

Q: You took them out?

A: Eventually.

Q: Okay. And the money that you took out of your escrow account, the $900, and the $2,700 that you collected in 1995, you used it for your own personal professional purposes, you didn't give it to Herschner [sic], did you?

A: No.

We conclude, therefore, that the findings of fact by the judge, and Respondent's admissions that he misappropriated his client's putative monies, provide clear and convincing evidence that Respondent willfully violated § 10–306.

### Violation of RPC Rule 8.4(c)

Judge Nolan found that Respondent did not defraud intentionally Allied or Hershner, but did find that "Respondent's decision to retain the funds however, defrauded Allied and/or Hershner of its legal claim to the settlement money." We are

unable to reconcile these two findings. Because Judge Nolan found no intentional fraud in "any decision" made by Respondent, and Bar Counsel does not dispute this finding, we do not believe that Bar Counsel has proven fraud by clear and convincing evidence. Therefore, we overrule the judge's finding that Respondent "defrauded Allied and/or Hershner of its legal claim to the settlement money."

In doing so, we conclude nonetheless that Respondent violated Rule 8.4(c) by engaging in dishonest conduct, rather than fraud. The separate categories of misconduct prohibited by the rule include "dishonesty, fraud, deceit or misrepresentation." The Petition for Disciplinary Action filed against Respondent with this Court alleged generally a violation of Rule 8.4(c) based on his conduct. In its Exceptions, the AGC maintained specifically that Respondent was both "dishonest and deceitful" with regard to his collections efforts against Perry.

In interpreting a District of Columbia disciplinary rule that is identically worded to Rule 8.4(c), the Court of Appeals for the District of Columbia has explained:

> these four terms should be understood as separate categories, denoting differences in meaning or degree. Thus, to the extent possible, each term should be read narrowly, so as not to engulf any of the remaining three. Moreover, if any term proves more general than the others, or encompasses another, only the more general term need be applied: we will find only one violation of the disciplinary rule upon a single set of facts.

> The most general term . . . is "dishonest," which encompasses fraudulent, deceitful, or misrepresentative behavior. In addition to these, however, it encompasses conduct evincing a lack of honesty, probity or integrity in principle; [a] lack of fairness and straightforwardness. . . . Thus, what may not legally be characterized as an act of fraud, deceit or misrepresentation may still evince dishonesty.

*In the Matter of Shorter,* 570 A.2d 760, 767–68 (D.C.App.1990) (citations omitted).[6] *See also In re Wilkins,* 649 A.2d 557, 561 (D.C.App.1994). This Court has previously adopted the explanation of the District of Columbia Court of Appeals in construing Maryland's RPC Rule 8.4(c). *See Glenn,* 341 Md. at 478, 671 A.2d at 477–78 (citing *In re Wilkins*). Based on our holding that Respondent violated RPC Rules 1.15(a), (b), and (c) and BOP § 10–306, we find clear and convincing evidence that Respondent exhibited a lack of probity, integrity and straightforwardness in his conduct regarding his client and, therefore, his actions were dishonest in that sense. *See In Matter of Shorter,* 570 A.2d at 768. We add to this the reinforcing observation that Respondent's efforts to collect attorneys' fees from Perry in 1995 were disingenuous. In his 29 October 1995 letter to Perry, he states:

> This [letter] will confirm our conversation and agreement late this afternoon to modify the Virginia consent judgment agreement as follows.
>
> The $450/month deal is off, but *Hershner and I will agree* to accept in full and final satisfaction of your Virginia judgment obligation, further payments totalling [sic] Twelve Thousand Dollars ($12,000.00).

(emphasis added). This letter signals that Respondent lead Perry to believe that Respondent acted at the behest and with the authority of his client. Respondent did not have such authority. Such conduct supports a finding that Respondent acted dishonestly.

### III.

Having concluded that the relevant ethical violations are supported by the record, we now address the issue of sanctions against Respondent. Bar Counsel recommends a sanction of indefinite suspension. Respondent recommends that "the Court impose a reprimand, or, at most, a suspension

---

6. The District of Columbia Court of Appeals discussed former D.C. disciplinary rule DR 1–102(A)(4), which is today D.C. RPC Rule 8.4(c).

of thirty (30) days to three (3) months." When imposing sanctions we keep in mind that:

> Because 'an attorney's character *must remain beyond reproach*' this Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public.

*Attorney Griev. Comm'n v. Deutsch,* 294 Md. 353, 368–69, 450 A.2d 1265, 1273 (1982) (citations omitted)(emphasis in original). Stated differently, this Court imposes sanctions to protect the public from harm, to uphold the integrity of the Maryland legal profession, and to deter other members of the profession from acting in a similar manner. *See Attorney Griev. Comm'n v. Webster,* 348 Md. 662, 678, 705 A.2d 1135, 1143 (1998).

We have several categories of ethical violations to consider in determining the sanction to impose on Respondent. We have held on numerous occasions that "[m]isappropriation of funds by an attorney is an act infested with deceit and dishonesty and ordinarily will result in disbarment in the absence of compelling extenuating circumstances justifying a lesser sanction." *Attorney Griev. Comm'n v. White,* 328 Md. 412, 417, 614 A.2d 955, 958 (1992); *Attorney Griev. Comm'n v. Bakas,* 323 Md. 395, 403, 593 A.2d 1087, 1091 (1991); *Attorney Griev. Comm'n v. Ezrin,* 312 Md. 603, 608–09, 541 A.2d 966 (1988); *Attorney Griev. Comm'n v. Cockrell,* 304 Md. 379, 393–94, 499 A.2d 928, 935 (1985). Such a sanction is justified because attorneys:

> must remember that the entrustment to them of the money and property of others involves a responsibility of the highest order. They must carefully administer and account for those funds. Appropriating any part of those funds to their own use and benefit *without clear authority* to do so cannot be tolerated.

*Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 345, 587 A.2d 511, 516 (1991)(emphasis added). This Court deals severely with attorneys who willfully misappropriate client monies. *See Attorney Griev. Comm'n v. Miller,* 301 Md. 592, 609, 483 A.2d 1281, 1290 (1984). In *Attorney Griev. Comm'n v. Willemain,* this Court asserted that:

It is essential that all members of the legal fraternity be strongly and constantly impressed with the truism that in handling moneys and properties belonging to their clients or others that they accept them in trust and are strictly accountable for their conduct in administering that trust, so they dare not appropriate those funds and properties for their personal use. The misappropriation by an attorney of funds of others entrusted to his care, be the amount small or large, is of great concern and represents the gravest form of professional misconduct.

305 Md. 665, 678, 506 A.2d 245, 253 (1986). In addition, the failure to communicate with a client and inattentiveness to a client's request warrant disciplinary sanctions. *See Attorney Griev. Comm'n v. Manning,* 318 Md. 697, 703, 569 A.2d 1250, 1253 (1990). In *Glenn,* we set forth a helpful framework for sanctions analysis:

Along with our own cases as precedent in determining the appropriate sanction, it is helpful for us to refer to the ABA Standards. These standards create an organizational framework that calls for a consideration of four questions:

(1) What is the nature of the ethical duty violated?

(2) What was the lawyer's mental state?

(3) What was the extent of the actual or potential injury caused by the lawyer's misconduct?

(4) Are there any aggravating or mitigating circumstances?

341 Md. at 484, 671 A.2d at 480 (citing to Standard 3.0 of the ABA Standards for Imposing Lawyer Sanctions, *reprinted in Selected Statutes, Rules and Standards on the Legal Profession,* 300 (1987)).

We have already discussed the nature of Respondent's ethical violations. He misappropriated client funds in viola-

tion of RPC Rule 1.15(a); he failed to notify his client upon the receipt of funds in violation of RPC Rule 1.15(b); he failed to provide a requested accounting in violation of RPC Rule 1.15(b); he failed to keep disputed funds separate until the dispute was resolved in violation of RPC Rule 1.15(c); he willfully removed funds for professional or personal use in violation of BOP § 10–316; and he engaged in dishonest conduct in violation of RPC Rule 8.4(c).

Our next step is to determine the state of mind of Respondent at the time of the violations. Respondent, in this regard, states "[i]t is questionable whether the Respondent's retention of the funds, to the extent any of it was client or third party funds, constituted misappropriation, but, assuming the Court of Appeals finds that misappropriation occurred, there is a serious question as to whether it was negligent, let alone knowing or intentional." We agree with Respondent that his state of mind at the time he violated the ethical rules is important in the context of mitigation. In *Glenn*, this Court explained:

> The ABA Standards establish graduated levels of culpability, with the most culpable mental state that of intent, the next most culpable mental state that of knowledge, and the least culpable mental state that of negligence. Intent is defined as "the conscious objective or purpose to accomplish a particular result." Knowledge is defined as "the conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." Negligence is defined as "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation."

341 Md. at 485, 671 A.2d at 481. Judge Nolan found that Respondent's actions were not intentionally fraudulent. We are constrained to accept that assessment, particularly given the judge's superior ability to evaluate demeanor-based credibility. We do find, however, clear and convincing evidence

that, at the time he acted, Respondent knew or should have known that his actions were unethical. "Knowing misappropriation" has been defined as "the taking by a lawyer of 'a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking.'" *Id.* (citing *Matter of Roth,* 140 N.J. 430, 658 A.2d 1264 (1995) (citations omitted)). We are wary that

> [t]he line between knowing misappropriation and negligent misappropriation is a thin one. 'Proving a state of mind—here, knowledge—poses difficulties in the absence of an outright admission.' However, this Court has noted that 'an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer 'knew' or 'had to know' that clients' funds were being invaded.' In this case, that circumstantial evidence includes repeated invasions of client funds that were required to be held inviolate. The testimony adduced convincingly suggests that respondent 'knew,' or 'had to know' that he was invading client funds.

*Id.* (citations omitted). We have far less difficulty in determining that Respondent knowingly failed to notify his client of the receipt of funds, failed to provide an accounting to Allied when requested, and failed to keep the funds separate during the disputes over the monies in 1992 and 1995.

We next turn to the third factor to consider: the extent of actual or potential injury caused by Respondent's misconduct. *See Glenn,* 341 Md. at 488, 671 A.2d at 483. Here, it is difficult to assess the actual financial injury caused to Hershner or its successor Allied. It seems clear that Hershner indeed did owe Respondent compensation for his services. The issue that concerns us most, however, is the potential injury that Respondent's conduct represents. He not only took client funds from escrow or never deposited them, but he failed to communicate with his client when funds were received, he failed to provide an accounting when requested, and he failed to keep client funds separate when in dispute. He also unilaterally attempted collection efforts in 1995 without client directive and under a guise that he possessed specific

settlement authority from his client in his collection efforts. We cannot understate the importance of holding funds in escrow in accordance with Rule 1.15 and how the Rule reinforces the public's confidence in our legal system. Escrow accounts serve as sanctuary for client funds from the attorney's creditors. *See Webster,* 348 Md. at 677, 705 A.2d at 1143–44. They also provide peace of mind and order to disputing parties, assuring that no one party will exercise control over the funds until an independent resolution of the dispute.

 Lastly, we consider a non-exhaustive list of mitigating factors which include:

absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Glenn,* 341 Md. at 488–89, 671 A.2d at 483 (citations omitted). Respondent asks us to consider that assertedly Virginia or Maryland statutory or common law vested him with a lien on the funds received from Perry and, therefore, he had authority to appropriate the funds paid by Perry. We have defined the nature of attorney liens before and explained that:

An attorney has a *retaining lien* on all papers, securities and money belonging to his client which come into his possession in the course of his professional employment. This is a general lien which gives him the right *to retain* such things until all his charges against his client are paid. As the name implies, it is dependent upon possession. It is, generally speaking, a passive lien and cannot be actively enforced either at law or in equity. The other lien is a *charging lien* which binds a judgment recovered through

the attorney's efforts. This lien, ... was based ùpon the broad principle of justice that an attorney, as a recognized officer of the court, should be paid his fees and expensès out of any judgment obtained as a result of his labor and skill. It was a means invented by the courts to protect attorneys from being cheated by their clients by preventing the clients from receiving the fruits of recoveries without paying for the valuable services by which the recoveries were obtained.

*Diamond v. Diamond,* 298 Md. 24, 34–35, 467 A.2d 510, 516 (1983) (citations omitted)(emphasis added). *Accord* Robert L. Rossi, 2 Attorney's Fees § 12:04 & § 12:09 (2d 1995).

■■■ This Court held that Maryland did not recognize charging liens, absent a statutory provision. *See Diamond,* 298 Md. at 35, 467 A.2d at 516. Maryland's statutory attorney's charging lien provision, enacted originally in 1985,[7] states currently:

Attorney's lien.

(a) *In general.*—Subject to subsection (b) of this section, an attorney at law has a lien on:

 (1) an action or proceeding of a client of the attorney at law from the time the action or proceeding begins; and

 (2) a judgment or award that a client receives as a result of legal services that the attorney at law performs.

(b) *Limited to fee agreement.*—A lien under this section attaches only if, and to the extent that, under a specific agreement between an attorney at law and a client, the client owes the attorney at law a fee or other compensation for legal services that produced the judgment or award.

---

**7.** *See* Annotated Code of Maryland (1957, 1987 Repl.Vol.), Art. 10, § 46. That statute was subsequently repealed in 1989 and the relevant provisions as they pertain to this case were incorporated into Maryland Code (1989, 1995 Repl.Vol.), Business Occupations & Professions Article, § 10–501.

\* \* \* \* \*

(d) *Execution.*—An attorney at law may retain property subject to a lien under this section and bring an action for execution under the lien only in accordance with rules that the Court of Appeals adopts. (An.Code 1957, art. 10, § 46; 1989, ch. 3, § 1; ch. 632, § 3.)

Maryland Code (1989, 1995 Repl.Vol. ), Business Occupations & Professions Article, § 10–501. These provisions of the statute are identical to the statute in effect in the years in which Respondent's conduct occurred with which this matter is concerned. It is fundamental under the rules of statutory interpretation that we look to the text of the statute to discern the legislature's intent. *See Gordon Family Partnership v. Gar On Jer,* 348 Md. 129, 137–38, 702 A.2d 753, 757 (1997). "Where, giving the words of the statute their ordinary and common meaning, the statute is clear and unambiguous, both in meaning and application, it usually is unnecessary to go further." *Id.* (citations omitted).

It is patent that it was impossible for Respondent to have complied with § 10–501 in 1991, 1992, and 1995. First, by providing in the statute that the attorney must "bring an action for execution" it is clear that, assuming *arguendo,* if Respondent were to have a valid charging lien, attempts to collect under such a claim must be done through proper process and judicial oversight. Respondent presented no evidence that he sought court approval under any theory. Second, the statute requires that such an action be brought "in accordance with rules that the Court of Appeals adopts." Unfortunately, no rules for bringing a charging lien action existed at the time Respondent violated his ethical duties in 1991, 1992, and 1995. We enacted the first such rules in 1996, subsequent to Respondent's violations. The absence of the rule, however, does not excuse Respondent's self-help measures.[8] We next turn to Respondent's assertion that he had a

---

8. We think it is appropriate to note that our current rule governing both retaining and charging liens sets forth intricate steps that an attorney

common law retaining lien against Hershner and Allied. In the context of retaining liens "[g]enerally, the only advantage the attorney gains from his retaining lien is the possibility of forcing his client to settle because of the embarrassment, inconvenience or worry caused by the attorney's asserting the lien." *Morfeld v. F.M. Andrews,* 579 P.2d 426, 433 (Wy.1978) (citations omitted). *Accord* Robert L. Rossi, 2 Attorney's Fees § 12:12 (2d 1995). Importantly, "[b]ecause a retaining lien is enforceable only by possession ... that lien cannot be satisfied out of the moneys [sic] retained." *Hoke v. Ortiz,* 83 N.Y.2d 323, 610 N.Y.S.2d 455, 632 N.E.2d 861, 865 (1994). Respondent has not pointed to a single case in Maryland or Virginia that gives him the right to take client funds, or funds in dispute, without judicial approval. The "right to retain" funds in escrow until the dispute is resolved under a retaining lien in no way translates into a right unilaterally to remove the funds for professional or personal use without independent or stipulated resolution to the conflict over fees. Respondent's

---

must take when asserting an attorney lien. Rule 2–652 states, in pertinent part:

(a) Retaining lien. Except as otherwise provided by the Maryland Rules of Professional Conduct, an attorney who has a common-law retaining lien for legal services rendered to a client may assert the lien by retaining the papers of the client in the possession of the attorney until the attorney's claim is satisfied.

(b) Statutory lien. An attorney who has a lien under Code, Business Occupations and Professions Article, § 10–501, may assert the lien by serving a written notice by certified mail or personal delivery upon the client and upon any person against whom the lien is to be enforced. The notice shall claim the lien, state the attorney's interest in the action, proceeding, judgment, or award, and inform the client or other person to hold any money payable or property passing to the client relating to the action, proceeding, judgment, or award.

(c) Adjudication of rights and lien disputes.

\* \* \* \*

(2) When no circuit court action has been filed. If a lien is asserted pursuant to this Rule and a related action has not been filed in a circuit court of this state, the attorney, the attorney's client, or any person who has received a notice pursuant to section (b) of this Rule may file a complaint with a circuit court to adjudicate the rights of the parties in relation to the lien, including the attorney's entitlement to a lien, any dispute as to the papers subject to a lien under section (a) of this Rule, and the amount of the attorney's claim.

alleged "right" directly conflicts with his ethical obligations under Rule 1.15. The RPC Rules "require that the funds in dispute be deposited in a proper escrow account, and not, as here, appropriated to the lawyer's own use without independent resolution of the underlying fee controversy." *Attorney Griev. Comm'n v. McIntire,* 286 Md. 87, 96, 405 A.2d 273, 278 (1979).

Even if Respondent had a valid lien, which we do not decide here, the "[m]ere existence of a legal right does not entitle a lawyer to stand on that right if ethical considerations require that he forego it." *An Anonymous Member of the South Carolina Bar,* 287 S.C. 250, 335 S.E.2d 803, 804 (1985). This Court will not countenance in a disciplinary proceeding such a self-help argument for vigilante lawyers who decide to take disputes over attorney's fees into their own hands. We find that Respondent's argument that he had a lien on the attorney's fees and, therefore, he had a right to take the funds and use them for personal or professional use without further ado, to be unpersuasive in mitigating the general rule of disbarment in misappropriation cases.

We do agree with Respondent, however, and find mitigating circumstances justifying a lesser sanction than disbarment, in the remoteness in time of the offenses in 1991 and 1992, as well as Respondent's acknowledgment that his conduct in dealing with Hershner in those years was unethical. In particular, we note that, because Hershner was no longer in existence at the time of the hearing, Respondent may have faced certain practical difficulties in proving other mitigating factors. Furthermore, it is significant that Judge Nolan found that Respondent did not act intentionally when he violated his ethical duties. We hold, therefore, that the appropriate sanction in this case is indefinite suspension, with the right to apply for reinstatement no earlier than one year from the beginning of the suspension. Our decision comports with our prior decisions which state that "[s]uspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or

potential injury to a client." *Powell,* 328 Md. at 302, 614 A.2d at 115 (approving ABA Standard 4.12). *See also Glenn,* 341 Md. at 491, 671 A.2d at 484. Accordingly, we order the following:

1. Respondent is indefinitely suspended from the practice of law, effective thirty days after the filing of this opinion.

2. Respondent shall:

(a) Within five days from the date of filing of this opinion provide Bar Counsel with a list of names and addresses of current clients, if any, and identify the matters pending in court; and

(b) Within fifteen days from the date of filing this opinion provide Bar Counsel with a copy of a letter mailed by Respondent to any current clients and to any adverse party (represented or unrepresented) notifying them that Respondent has been indefinitely suspended.

3. Respondent may apply for reinstatement no earlier than one year from the effective date of this suspension and upon having satisfied Bar Counsel that the following conditions have been met:

(a) Respondent shall have complied with paragraph 2 of this order; and

(b) Respondent shall have paid all costs assessed pursuant to the mandate in this matter.

*IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–715(C), FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST ROBERT J. SHERIDAN.*