933 A.2d 842

ATTORNEY GRIEVANCE COMMISSION OF MARYLAND

v.

Jeffrey LAWSON.

Misc. Docket AG No. 15 Sept. Term, 2006.

Court of Appeals of Maryland.

Oct. 11, 2007.

538

Dolores O. Ridgell, Asst. Bar Counsel (Melvin Hirshman, Bar Counsel, Atty. Grievance Comm'n of Maryland), for Petitioner.

Edward Smith, Jr., Baltimore, for Respondent.

Argued before BELL, C.J., RAKER, HARRELL, BATTAGLIA, GREENE, ALAN M. WILNER, (retired, specially assigned), DALE R. CATHELL, (retired, specially assigned), JJ.

BATTAGLIA, Judge.

The Attorney Grievance Commission of Maryland ("Petitioner"), acting through Bar Counsel and pursuant to Maryland Rule 16–751(a),[1] filed a petition for disciplinary or remedial action against Respondent, Jeffrey Lawson on June 7, 2006. Bar Counsel alleged that Respondent violated Maryland Rules of Professional Conduct ("MRPC"), 1.3 (Diligence),[2] 1.4 (Communication),[3] 1.5 (Fees),[4] 1.15 (Safekeeping Proper-

---

**1.** Maryland Rule 16–751(a) provides:

(a) **Commencement of disciplinary or remedial action.** (1) Upon approval of [the Attorney Grievance] Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

**2.** Rule 1.3 provides:

A lawyer shall act with reasonable diligence and promptness in representing a client.

**3.** Rule 1.4 provides:

(a) A lawyer shall:
(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;
(2) keep the client reasonably informed about the status of the matter;
(3) promptly comply with reasonable requests for information; and
(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

ty),[5] 1.16 (Declining or Terminating Representation),[6] and 8.4

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

4. Rule 1.5 provides in pertinent part:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:
(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.
(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

5. Rule 1.15 provides in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.
* * *
(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the

(Misconduct),[7] as well as Maryland Rule 16–603 (Duty to Maintain Account),[8] Maryland Rule 16–604 (Trust Account—Required Deposits),[9] and Maryland Rule 16–609 (Prohibited

client or third person, shall promptly render a full accounting regarding such property.

(e) When in the course of representation a lawyer is in possession of property in which two or more persons (one of whom may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the property as to which the interests are not in dispute.

6. Rule 1.16 states in pertinent part:

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

7. Rule 8.4 provides in relevant part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice. . . .

8. Maryland Rule 16–603 provides:

An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in a state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source intended in whole or in part for the benefit of a client or third person.

9. Maryland Rule 16–604 states:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part

Transactions).[10]

In accordance with Maryland Rules 16–752(a) and 16–757(c),[11] we referred the petition to Judge Robert E. Cahill, Jr. of the Circuit Court for Baltimore County for an evidentiary hearing and to make findings of fact and conclusions of law. Judge Cahill held a hearing on January 31, 2007 and issued Findings of Fact and Conclusions of Law on April 19, 2007, in which he found by clear and convincing evidence that Respondent had violated MRPC 1.4(a), 1.5, 1.15, and 8.4 and Maryland Rules 16–604 and 16–609:

*FINDINGS OF FACT AND CONCLUSIONS OF LAW*
*BACKGROUND*

"On February 8, 2006, the Court of Appeals of Maryland transmitted this matter to the Circuit Court for Baltimore

---

to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

**10.** Maryland Rule 16–609 states:
An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

**11.** Maryland Rule 16–752(a) states:
(a) **Order.** Upon the filing of a Petition for Disciplinary or Remedial Action, the Court of Appeals may enter an order designating a judge of any circuit court to hear the action and the clerk responsible for maintaining the record. The order of designation shall require the judge, after consultation with Bar Counsel and the attorney, to enter a scheduling order defining the extent of discovery and setting dates for the completion of discovery, filing of motions, and hearing. Maryland Rule 16–757(c) states in pertinent part:
(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law.

County for the purpose of conducting a hearing pursuant to Maryland Rule 16–757. Edward Smith, Jr., Esquire, entered his appearance for the Respondent on November 21, 2006. Before commencement of the hearing, the Court granted in part the Petitioner's Motion for Sanctions, precluding Respondent from testifying that he had used an attorney trust account to escrow the legal fee that forms part of the subject matter of this action, based on his refusal to disclose information about that account properly sought in discovery. The hearing was held on January 31, 2007.

*CHARGES*

"All of the charges lodged against the Respondent arise from an attorney-client relationship which commenced on April 24, 2005 when Timothy Dean ("Dean") retained the Respondent to represent him in litigation filed in the Circuit Court for Baltimore City. Dean and two (2) related corporate entities had been sued by Dean's business associate, Shedric Wallace ("Wallace"), over disagreements concerning their ownership of a restaurant. The Respondent, who had been admitted to practice law in Maryland for some thirteen (13) months before being retained by Dean, accepted a legal fee of $5,000.00 from Dean, and prepared and had Dean sign a written fee agreement on April 24, 2005. Respondent entered his appearance on behalf of Dean and the two related entities on April 28, 2005. He confirmed in an e-mail to Dean on May 23, 2005 that he would "vigorously represent all Defendants" in the litigation. He filed a Motion to Dismiss/for Summary Judgment and sent discovery pleadings to Wallace on behalf of Dean and the related entities on May 26, 2005. In late May, he began insisting that he be paid an additional $5,000.00 to represent the two (2) related corporate entities. Dean, on behalf of the other entities, refused. Respondent immediately began threatening to withdraw. Respondent prepared and sent to Dean, on June 21, 2005, a Motion for Leave to Withdraw as Counsel for the Defendants. Dean filed a pro se opposition to this, based on the fact that he had made a flat fee payment to Respondent for representation through trial.

On August 11, 2005, the Circuit Court ordered that Respondent's appearance be withdrawn. Previous to this Order allowing Respondent to withdraw his appearance on behalf of the Defendants, specifically on July 19, 2005, another attorney, Edward A. Malone, Esquire, had entered his appearance on behalf of these Defendants. Also on July 19, Mr. Malone filed a Counter Complaint on behalf of all Defendants and a Third–Party Complaint. On December 1, 2006 a Settlement Order was filed and the case was dismissed on December 22, 2006, with Dean paying Wallace in excess of $65,000.00 to resolve all disputes.

"As a result of a complaint letter purportedly authored by Dean on August 8, 2005, dealing primarily with the unreasonableness of the Respondent's fee, and his failure to refund it or any part of it after withdrawing his appearance, the Attorney Grievance Commission of Maryland has charged Lawson with violating certain of Maryland's Rules of Professional Conduct, as well as procedural Rules governing attorney trust accounts. Specifically, it is alleged that the Respondent has violated the following provisions:

"Rule 1.3 **Diligence**

A lawyer shall act with reasonable diligence and promptness in representing a client.

"Rule 1.4 **Communication**

(a) A lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

"Rule 1.5 **Fees**

(a) A lawyer's fees shall be reasonable. The factors to be considered in determining the reasonableness of the fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the result obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

(b) When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation.

"Rule 1.15 **Safekeeping Property**

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules. Other property shall be identified as such and appropriately safeguarded. Complete records of such account funds and of other property shall be kept by the lawyer and shall be preserved for a period of five years after termination of the representation.

(b) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(c) When in the course of representation a lawyer is in possession of property in which both the lawyer and another person claim interests, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved.

"Rule 1.16 **Declining or Terminating Representation**

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee that has not been earned. The lawyer may retain papers relating to the client to the extent permitted by other law.

"Rule 8.4 **Misconduct**

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice.

"Maryland Rule 16–603 **Duty to Maintain Account**

An attorney or the attorney's law firm shall maintain one or more attorney trust accounts for the deposit of funds received from any source for the intended benefit of clients or third persons. The account or accounts shall be maintained in this State, in the District of Columbia, or in any state contiguous to this State, and shall be with an approved financial institution. Unless an attorney maintains such an account, or is a member of or employed by a

law firm that maintains such an account, an attorney may not receive and accept funds as an attorney from any source in whole or in part for the benefit of a client or third person.

"Maryland Rule 16–604 **Trust Account–Required Deposit**

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed by the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution. This Rule does not apply to an instrument received by an attorney or law firm that is made payable solely to a client or third person and is transmitted directly to the client or third person.

"Maryland Rule 16–609 **Prohibited Transaction**

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in the attorney's trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

"Essentially, in the Petition, the Attorney Grievance Commission charges the Respondent in four (4) discrete areas:

"First, with regard to the provisions governing attorney **diligence, promptness, and failure to protect a client's interest upon termination,** the Respondent is charged with failing to file a Counterclaim against Wallace; and failure to promptly transmit his office file to his successor counsel, Mr. Malone. Respondent defends by asserting that the Counterclaim could have been and, in fact, was filed by his successor and that, in any event, he was ethically prohibited from filing the Counterclaim. He asserts that he transmitted his office file to his successor in a timely fashion.

"Second, with regard to the provisions governing **communication** with a client, the Respondent is charged with failing to inform Dean that the Circuit Court for Baltimore City had scheduled a hearing on the Motion to Dismiss/for Summary Judgment on July 6, 2005 and failing to inform Dean after the hearing that the motion was denied. He is also charged with failure to properly communicate the terms of the Fee Agreement and failure to communicate to Dean the reasons for not filing the Counterclaim. Respondent asserts that the hearing on the Motion to Dismiss did not require Dean's attendance, and so there was no need to inform him of the hearing date or the outcome of the hearing.

"Third, with regard to the cited provisions governing attorney dishonesty, fraud or **deceit and conduct prejudicial to the administration of justice,** Respondent is accused of misleading Dean concerning his plans for charging legal fees in the future. It is alleged, in essence, that the Respondent planned to initially charge Dean a $5,000.00 flat fee, and then to insist upon additional payments, in the form of separate fees for the representation of the two (2) corporations, at a later date. In the alternative, it is alleged that the fact that Respondent attempted to change the agreement in the midst of his representation was dishonest and deceitful and amounted to conduct prejudicial to the administration of justice. Respondent asserts that the proof does not meet the "clear and convincing" standard on thee questions.

"Fourth, with regard to the provisions concerning **reasonable attorneys' fees** and the holding and disposition of those fees after being engaged, the Respondent is charged with charging an unreasonable fee; failing to escrow the fee before it was earned; and failing to segregate and return the fee once he learned that Dean was insisting upon a refund of all or part of it.

"Respondent asserts that the amount of the flat fee charged, $5,000.00, was patently not unreasonable in light of the scope of the initial undertaking; that he never had a

duty to escrow or safe-keep the fee payments because they had been earned (if compared to what Respondent would have charged on an hourly basis) by the time the dispute arose; and that the flat fee arrangement was, in any event, permissible without the need to place the fee in trust. He maintains that Respondent "had a right to demand additional compensation."

*FINDINGS OF FACT*

"Respondent was admitted to the Bar of the Court of Appeals of Maryland on April 1, 2004. At all times relevant to this mater, he maintained an office for the practice of law in Baltimore County, Maryland. At the inception of the engagement giving rise to this disciplinary action, the Respondent had been practicing law for some thirteen (13) months. He was, at all times relevant hereto a solo practitioner. He testified that he had maintained a law clerk's position with Jimmy A. Bell, PC, an Upper Marlboro practitioner, before being admitted to the Bar, and on his Professional Sketch indicates that he was an "Associate, Law Office of Jimmy A. Bell, PC, 2003."

"On or about April 13, 2005, an action was filed in the Circuit Court for Baltimore City bearing the caption *SHE-DRIC WALLACE v. TIMOTHY DEAN and DEAN AND WALLACE INCORPORATED and T.D. BISTRO, INC.,* Case No. 24–C–05–04165 CN. Wallace alleged in his suit that he and Dean formed Dean and Wallace Incorporated for the purpose of owning and operating a restaurant in the Fells Point neighborhood of Baltimore City. He alleged that Dean had shut him out of the business in early April 2005. He sued Dean and the corporations for breach of contract, interference with prospective advantage, fraud and breach of fiduciary duty. The fifth count in the Complaint was a shareholder's derivative action. The theory advanced against T.D. Bistro, Inc. was that when Dean shut Wallace out of the business, he "transferred" the lease of the restaurant property "into the name of T.D. Bistro which Dean solely owned." A jury trial was prayed.

"While service on the Defendants was not made until April 26, 2005, sometime before April 22, 2005, an attorney with whom Dean had a prior lawyer-client relationship, Jimmy A. Bell ("Bell"), received a copy of the Complaint from Dean, or from the attorney for Wallace. Bell determined that he had a "possible conflict" and could not represent Dean or any of the other defendants in the litigation; and would refer the matter to other counsel. Accordingly, Bell arranged a meeting between Dean and the Respondent at Dean's restaurant in Baltimore to accommodate the referral. While Bell believed that he could not represent Dean or the entities because of a conflict of interest, he had himself drafted (or had someone else do so at his direction) responsive pleadings to be filed in the Baltimore City litigation, and had charged Dean $2,500.00 to draft these pleadings.[1] He brought these with him to the meeting or otherwise delivered them to Respondent just after the meeting.

[1] While Bell is not a subject of these disciplinary proceedings, he testified at the hearing. His failure to recognize that there was *absolutely* a conflict in either he or the Respondent representing a Defendant that is partially owned by the Plaintiff (Dean & Wallace Incorporated was owned in part by Wallace); his failure to appreciate that "ghost writing" pleadings in litigation where the lawyer is in a conflict is a violation of Rule 1.7; and his referrals to this litigation as "a pimple" and a "small case" were, to be charitable, troubling.

"At the meeting (or before), Respondent was also given a copy of the Complaint setting forth the names of all three (3) Defendants. Bell testified, credibly, that the Respondent knew that there were three (3) Defendants to be represented at the time of the meeting. He testified, again credibly, that he and the Respondent discussed whether or not there might be a conflict with one attorney representing all three (3) Defendants, but ultimately, the Respondent agreed with Dean that he would represent all three (3) Defendants. Bell testified that he thought a $5,000.00 flat fee for representation of all three (3) Defendants through trial would be fair, and he so advised the Respondent. He testified that he thought this to be the case because he had

already drafted responsive pleadings on behalf of the three (3) Defendants, or in other words, "done all the work. . . ."

"On April 22, 2005, Respondent wrote a letter to Dean and had it hand delivered. In this letter, Respondent acknowledged that he had received a copy of the Complaint from Bell and he specifically discussed that the Complaint named three parties as Defendants, namely, Dean, Dean and Wallace, Incorporated and T.D. Bistro, Inc. In the letter, Respondent discussed the fact that the case was probably not removable to Federal Court because of the absence of complete diversity as to these Defendants. Respondent ends his letter by asking Dean to "please read the enclosed Attorney–Client Fee Agreement." It is not clear which version of the Fee Agreement was attached to this letter.

"Ultimately, on April 24, 2005, Respondent hand delivered another letter to Dean transmitting another iteration of the Attorney–Client Fee Agreement. This Agreement, which was between Lawson Law, LLC and Dean only was signed by Dean on April 24.[2] The Court finds by clear and convincing evidence and beyond any doubt that the Respondent knew, before April 22, 2005 that there were three (3) individual Defendants who had been sued in the Baltimore City litigation and who required representation. The Respondent's testimony at trial that he did not have a copy of the Complaint at the meeting at Dean's restaurant or when he presented the Fee Agreement to Dean was not credible. The Respondent's testimony that he did not know or appreciate that there were three (3) individual Defendants who were the subjects of this suit in Baltimore City and who needed representation when he initially set the fee for that representation is not credible.[3]

[2] The version of the Agreement that was signed by Dean is part of Plaintiff's Exhibit 1 (attachment 1 to Exhibit 1). The version of the April 24, 2005 letter entered in evidence as Defendant's Exhibit 4 is followed by two (2) unsigned versions of the Attorney–Client Agreement with signature lines for Dean & Wallace Incorporated and T.D. Bistro, Inc. Ordinarily, the existence of these other iterations of the Agreement would be curious, but not material. Here, if material at all, the word processing changes would tend to support a finding that Respon-

dent knew he was being engaged to represent three (3) separate parties before he sent the Fee Agreement to Dean.

[3] Respondent was given a copy of the Complaint at or before the first meeting; he wrote to Dean on April 22, 2005 discussing the existence of three (3) individual Defendants; both Bell and Dean testified that Respondent's representation of the three (3) Defendants was discussed at the initial meeting; On April 28, 2005, Respondent entered his appearance on behalf of Dean, Wallace and Dean, Incorporated and T.D. Bistro, Inc.; and, he ultimately filed a Motion to Dismiss on behalf of all three (3) entities. While the actual Fee Agreement is between the Respondent and Dean only, the evidence is overwhelming that Respondent knew that there were three (3) Defendants to be represented in the Baltimore City litigation from the very beginning of his involvement.

"The Attorney–Client Fee Agreement itself, that is, the version ultimately signed by Dean on April 24, 2005, is somewhat confusing. It was not made less so when Respondent attempted to explain the Agreement to Dean in e-mails, or to testify as to what it meant before this Court. In the written Agreement, Respondent agrees that he will represent Dean "through trial of your civil case in the Circuit Court for Baltimore City filed or to be filed by Shedric Wallace." The Agreement states:

"4. *NON–REFUNDABLE CHARGEABLE RETAINER.*

You agree to pay Lawson Law, LLC a fee for legal services in the amount of Five Thousand Dollars ($5,000.00) (U.S.D.), in exchange for our agreement to represent you through trial in this matter. This amount will cover a non-refundable retainer in the amount of Two Thousand Five Hundred Dollars ($2,500.00) (U.S.D.), with the balance of the fee representing a substantial discount of the anticipated costs of this litigation, which will include, at least, a counter suit against Mr. Wallace. In exchange for this benefit, Lawson Law, LLC will receive a one-third (1/3) of any recovery, up to and including trial, plus costs. Any unearned portion of the $5,000.00 fee will be refunded to [sic] although, due to discounted rate you have been charged in lieu of the hourly fee of $250.00 per hour, the amount of legal time required for your case will likely exceed the amount your are [sic] required to pay

out of pocket and this possibility is not likely under the circumstances.

\* \* \*

## "5. COSTS AND OTHER CHARGES

(a) In general—Lawson Law LLC will bill client for additional costs and expenses in performing legal services under this agreement. . . .

\* \* \*

## "6. DISCHARGE AND WITHDRAWAL

You may discharge Lawson Law, LLC at any time. We may withdraw with your consent or for good cause. Good cause includes your breach of this agreement, your refusal to cooperate with us or to follow our advice on a material matter or any fact or circumstance that would render our continuing representation unlawful or unethical.

When our services conclude, all unpaid charges will become due and payable. After our services conclude, we will, upon your request, deliver your file to you along with any funds or property of yours in our possession, except to the extent that such property serves to secure payment of some outstanding charge.

When you discharge Lawson Law, LLC, you become liable for payment of the hourly rate for all charges incurred to date. This means that if you receive a discount for legal services, your early termination will require you to pay all costs and fees through termination as if you retained Lawson Law, LLC strictly on an hourly basis. . . .

"Ultimately, Dean did pay Respondent $5,000.00, in installments of $2,500.00 each, on April 26, 2005 and May 23, 2005. Respondent's testimony as to what the Attorney–Client Fee Agreement meant was as follows:

"Q. Didn't the fee agreement that you provided to Mr. Dean indicate that you would represent him in the litigation through trial?

"A. That I'd represent him through trial?

"Q. Yes.

"A. Yes.

"Q. And that the fee would be $5,000.00, correct?

"A. Yes.

"Q. All right. As of April the 26th, had you represented him through trial?

"A. As of April 26th—

"Q. —of 2005, when you received the first check, had you represented him through trial?

"A. Yeah, I received the first check on April 26th. It wasn't payable on April 26th, from what I recall. It was payable in May.

"Q. All right. In May of 2005, had you represented Mr. Dean through trial?

"A. No, I had not.

"Q. Well, then how can you say that you'd earned the money?

"A. Because, as I said in the retainer, that the retainer was a non-refundable, chargeable retainer—

"Q. All right. What about the second $2,500.00?

"A. I wasn't finished. Can I finish my answer?

"As I said in the retainer, the retainer was a non-refundable, chargeable retainer, meaning that the hourly rate that I would normally charge is the basis for the amount that I charged. That's how I get to the chargeable.

"If there would be anything that would be due to Mr. Dean as a refund, it would be based on that. I would subtract the amount of work that I did and then give him back anything less than the amount that he was charged.

"For example, if I did $4,999.00 worth of work, I would give him back $1.00.

"Q. Are you finished?

"A. Yes.

"Q. All right. Mr. Lawson, did Mr. Dean hire you to work at an hourly rate?

"A. No.

"Q. All right. He hired you for a flat fee, correct?

"A. No.

"Q. He hired you with the understanding that you would represent him through trial for $5,000.00, correct?

"A. No.

"Q. Well, then what were the writings that you were giving him?

"A. The writing said $5,000.00, costs, and a third.

"Q. Okay. But as far as the attorney fees, $5,000.00 was what you agreed to represent him for for trial?

"A. I agreed to represent him for $5,000.00, and a third of any recovery, and costs. So, if the recovery ended up being $400,000.00, it would be $500,000 [sic] plus one-third of—

"Q. That wasn't my question. My question was, did you agree to represent him through trial for $5,000.00?

"A. I think I've answered that question. I don't know if -

"Q. Well, I don't believe you have. Let's move on.

"The Court finds that the Respondent entered into a flat fee arrangement with Dean, which required him to defend Dean, Wallace and Dean Incorporated and T.D. Bistro, Inc., through the conclusion of trial in the Wallace matter, in the Circuit Court for Baltimore City. This fee also included the preparation of a "counter suit" against Wallace. The fee for these services was $5,000.00. If there was an affirmative recovery against Wallace, Respondent would be entitled to an additional fee equivalent to one-third (1/3) of the amount

of that recovery. In addition, Dean agreed to pay "costs" as incurred by Respondent including long distance telephone charges, messenger and delivery fees, postage, transcript fees, subpoena fees, etc.

"The terms "Non–Refundable Chargeable Retainer" and "Non–Refundable Retainer" used in paragraph 4 of the Agreement are without meaning. It is plain that the flat fee *was*, in fact, refundable (paragraph 4: "Any unearned portion of the $5,000.00 fee will be refunded . . . ."; paragraph 6: "After our services conclude, we will, upon your request, deliver . . . any funds or property of yours in our possession . . . ."), and it is equally clear that Respondent failed to place any portion of the $5,000.00 payment into an escrow account.

"Respondent entered his appearance on behalf of all three (3) Defendants on April 28, 2005. On May 23, 2005, the Respondent e-mailed Dean stating:

"As we discussed on the issue of conflict of interest in the litigation by Mr. Wallace, each party sued could have independent counsel. This would be particularly true if Dean and Wallace, Inc. sued in proper capacity. It should be a Plaintiff along with Mr. Wallace. However, as Mr. Wallace has listed Dean and Wallace, Inc. as a Defendant and as you have consented to representation by Lawson Law, LLC of all Defendants at this time, such should satisfy the Rules.

"In time, it may be wise to bring in other counsel. We will monitor the events as they unfold. I do want to continue to represent T.D. Bistro, Inc./Timothy Dean Bistro. As you know, I will vigorously represent all Defendants in the interim. Please do not retain separate counsel without first discussing it with me and seeking my input. Such is not necessary at this time.

"On May 24, 2005, Respondent informed Dean, for the first time, that he would require that "retainers" be signed for Dean and Wallace, Incorporated and T.D. Bistro, Inc. This was done by e-mail and the Respondent use the word "retainer" to mean written agreement. On May 26, 2005,

Respondent filed a Motion to Dismiss/for Summary Judgement/Statement of Grounds and Authorities and a Discovery Notice (certifying that he had sent Interrogatories, a Request for Production of Documents and a Request for Admission of Facts and Genuineness of Documents to Wallace's attorney) in the Circuit Court action. The Motion was filed on behalf of all three (3) Defendants; the discovery pleadings on behalf of Dean and Wallace Incorporated only. On May 31, 2005, Respondent e-mailed Dean again and informed him that he would require an additional $2,500.00 fee for representation of Dean and Wallace, Incorporated, and yet an additional $2,500.00 fee for the representation of T.D. Bistro, Inc.[4] On the same day, Dean returned the Respondent's e-mail rejecting any further payment. He wrote that "it is impossible to pay $12,000.00 for one motion being filed...." Apparently, Dean was referring to the original $2,500.00 payment which he had made to Mr. Bell, the $5,000.00 payment that was made to Respondent, and the additional $5,000.00 payment that was being requested by the Respondent. Dean appears to have miscalculated and was $500.00 short of the total fee that Respondent was actually requiring at that point. In any event, the Respondent replied by e-mail of June 1, 2005 stating:

[4] Attached to this communication was a form of hourly billing summary which Respondent asserted established that he had spent $12,750.00 in time on the matter during the preceding month, if his time was billed at a rate of $250.00 per hour (Petitioner's Exhibit 1, Tab 1, Ex. 3). It is unclear how Respondent could have run up $12,750.00 in fees, principally to put together a motion that, apparently, had already been prepared and billed for by Mr. Bell. But the more important point is that Respondent appears to have been using this hourly billing comparison to justify the proposed charge in the flat fee billing arrangement. This was not a proper bargaining tool.

"All that's owed is $5,000.00—not $12,000.00. I know non-lawyers can't understand, but the "one motion" was no simple motion, especially if it disposes of five claims. Let's not pretend.

"I can't remain on a case that I'm not paid for. Everyone has got bills and I've got my own. I don't appreciate

excuses and I don't give them. I'm sure you understand that.

"I will exit from this case this week, if necessary. I don't want to go, but this is business. I will, if necessary. Even if I leave, it won't change the fact that I will still need to be paid for my work. . . .

"Dean responded to this e-mail, again taking the position that he and the Respondent had a deal, requiring representation through trial for the $5,000.00 fee. Dean stated that "If you fail to continue representation I will have no choice but to contact Bar Counsel for your misconduct." Respondent replied stating that "neither Bar Counsel nor any attorney can negate the fee for services payable by Dean and Wallace, Inc. and T.D. Bistro, Inc."

"On June 7, 2005, Dean wrote a letter to Respondent, again stating that he was "concerned about the given fees and would like to have this matter discussed in greater detail with both attorney, Jim Bell, and yourself." On the same date, Respondent faxed a letter back to Dean, continuing in his effort to persuade Dean to pay an additional $5,000.00 for the representation of Dean and Wallace Incorporated and T.D. Bistro, Inc. He stated:

"You will also find a copy of the original Entry of Appearance, a copy of which you possess. This Entry was not filed, but was the one prepared before Lawson Law, LLC received the Complaint and summonses for each of these defendants in the action. You will note that on the Entry, as well as on the Fee Agreement, you are listed in your individual capacity alone, not with Dean & Wallace, Inc. or T.D. Bistro, Inc.

"Even if you had been listed together, Maryland courts interpreting the Maryland Rules of Professional Conduct have acknowledged that a fee which may have been reasonable when made may become unreasonable in light of changed circumstances. A fee of $5,000.00 for one law firm to represent three separate clients in this complex litigation is unreasonably low, particularly in light of the

time, labor, skill required, the amount of time to be taken from other cases, etc. . . .

"On June 21, 2005, Respondent and Dean exchanged communications. Dean sent an e-mail stating: "Good morning Jeff I hope all is well. The purpose of this e-mail is to find out what is the status of the Motion to Dismiss? When time permits please give me a call." Respondent wrote back but did not answer Dean's question concerning the Motion to Dismiss. Instead, Respondent sent Dean a copy of a Motion for Leave to Withdraw as Counsel in the litigation. Though Respondent's cover letter stated that "Lawson Law LLC and Jeffrey Lawson, Esquire intend to file this Motion to Withdraw as Counsel in your case," Dean believed that the Motion had been filed, since it had a certificate of service, and, on June 30, 2005, Dean actually filed Timothy Dean's Opposition to Counsel's Motion to Withdraw as Counsel. On the same date, Respondent filed a Motion for Judicial Notice and Reply to Plaintiff's Response to Motion to Dismiss/for Summary Judgment, asking that the Court accept certain facts as established for the purposes of the Motion to Dismiss/for Summary Judgment.

"On July 6, 2005, Respondent attended a hearing on the Motion to Dismiss/for Summary Judgment. Respondent did not inform Dean that a hearing had been scheduled and did not inform Dean that the Motion to Dismiss was denied without prejudice on the same date. On July 14, 2005, Respondent actually filed his Motion to Withdraw as Counsel on behalf of all three (3) Defendants.

"He wrote Dean that same day stating that "As your actions and course of conduct, along with others, have led me to conclude that you attempted to utilize Lawson Law, LLC to foster your efforts to commit fraud on the court and, perhaps the Plaintiff in the civil action in the Circuit Court for Baltimore City, Lawson Law cannot, in good faith, submit further pleadings and papers on your behalf. . . ." On July 19, 2005, Edward Malone, Esquire entered his appearance in the Baltimore City litigation on behalf of all three (3) Defendants. On the same date, he filed a Coun-

ter–Complaint on behalf of Dean and Wallace Incorporated and T.D. Bistro, Inc., only against Wallace, and a Third–Party Complaint against Wallace's wife and another corporation as well. On August 8, 2005, Mr. Malone wrote Respondent, asking for his file in the *Wallace v. Dean* case, and stating that "any further delay will hinder this office in compelling Wallace to produce discovery." On August 11, 2005, the Court ordered that Respondent's appearance be withdrawn. On August 31, 2005, that Order was docketed, and the Respondent sent his office file to Mr. Malone on the same date.

"Substantial pleading and, apparently discovery took place in the action during the ensuing fifteen (15) months, culminating in a settlement of all claims, evidenced by the filing of a Settlement Order on December 1, 2006 and stipulations of dismissal thereafter. Dean paid Wallace some $65,000.00 to resolve all claims and presumably to acquire Wallace's interest in the restaurant business.

"Respondent never filed a Counterclaim against Wallace as agreed. Edward Malone filed the Counterclaim against Wallace on the date that he entered his appearance. Respondent's testimony on this issue was that he consciously decided not to file a Counterclaim against Wallace because he had developed concerns about Dean's "being truthful," and reached a conclusion that "it wouldn't be ethical for me to file a complaint against Mr. Wallace...." Respondent testified repeatedly that he informed Dean of this in a letter.[5] Respondent never produced such a letter at trial despite repeated attempts of he and his attorney to locate it.

[5] "I wrote him a letter, I believe it was in May, telling him that in light of the conversations I had with the people with Rewards Network and their being their telling me about Mr. Dean being there, and Mr. Wallace and Mr. Dean actually meeting with the Rewards Network representatives at the Bistro itself after he had told me he didn't know anything about it, you know, that it just led me to believe that he and Jim were not really being truthful about what was going on."

*CONCLUSIONS OF LAW*

### DILIGENCE, PROMPTNESS AND FAILURE
### TO PROTECT A CLIENT'S INTERESTS
### UPON TERMINATION

"The Petitioner has failed to establish by clear and convincing evidence that the Respondent violated Rule 1.3 or Rule 1.16(d). With regard to the alleged violation of Rule 1.16(d), the evidence before the Court is that the Respondent sent his office file to Mr. Malone on August 31, 2005–the exact date on which the Circuit Court for Baltimore City docketed the August 11, 2005 Order allowing the Respondent to withdraw. There is no evidence that during the time period July 19, 2005 (when Mr. Malone entered his appearance) through August 31, 2005 (when Respondent ultimately did send his office file to Mr. Malone), Dean or the related entities were in default with regard to discovery obligations. Indeed, there is no evidence that Malone had any particular need for Respondent's office file during this time period. He had drafted and filed a Counter–Complaint and a Third–Party Complaint and did not appear hampered in his preparation of the defense by not having Respondent's office file during that time period. In any event, the Petitioner has failed to establish by clear and convincing evidence that the Respondent did not "take steps to the extent reasonably practicable to protect a client's interests" in not transmitting his office file to Malone sooner.

"With regard to the allegation that the Respondent breached Rule 1.3 by failing to act with reasonable diligence and promptness in filing a Counterclaim, again, the Court finds that the Petitioner has failed to meet the burden of establishing a violation by clear and convincing evidence. Based on the assertions made in his letter of complaint, Dean would appear to believe that the Respondent risked a time bar by not filing a Counterclaim along with the Motion to Dismiss/for Summary Judgement in late May. However, the Motion was filed pursuant to Rules 2–311, 2–322(b)(2) and 2–501. Rule 2–321(c) provides as follows:

"**Automatic extension.** When a motion is filed pursuant to Rule 2–322, the time for filing an answer is extended

without special order to 15 days after entry of the court's order on the motion or, if the court grants a motion for a more definite statement, to 15 days after the service of the more definite statement.

"Rule 2–331 (d) which governs the timing of the filing of a Counterclaim, provides as follows:

"**Time for filing.** If a party files a counterclaim or cross-claim more than 30 days after the time for filing that party's answer, any other party may object to the late filing by a motion to strike filed within 15 days of service of the counterclaim or cross-claim. . . .

"Since the Motion to Dismiss/for Summary Judgment was denied on July 6, 2005, Respondent had until July 21, 2005 to file and answer pursuant to Rule 2–321(c); and he had 30 days after that within which to file a Counterclaim pursuant to Rule 2–331(d). Even if he had filed the Counterclaim beyond that extended date, it would not have been time barred, but rather, simply subject to being struck if the Defendants were unable to ultimately establish that any delay did not prejudice other parties to action. *See,* Rule 2–331(d).

"In any event, Mr. Malone had entered his appearance within 15 days of the July 6, 2005 denial of the Motion to Dismiss/for Summary Judgement and filed the Counter–Complaint. None of the Defendants was prejudiced by the timing of the filing of the Counter–Complaint, and none was placed in jeopardy by the fact that the Respondent did not file the Counterclaim at the same time that he filed the Motion to Dismiss/for Summary Judgement. There is simply nothing grievable about the Respondent's failure to earlier file a Counterclaim except, possibly, that he failed to inform Dean that there was ample time within which to do so.

"Despite this, the Respondent robustly and repeatedly asserted at trial that he consciously decided not to file a Counterclaim against Wallace because he had developed grave concerns about Dean's honesty, and reached a conclusion that it would not be ethical to assert a Counterclaim

against Wallace in the litigation. Respondent testified that he put all of this in a letter to Dean to explain why he was not filing the Counterclaim, a letter that he was never able to produce.

"While the proof is wanting with regard to the charges of failing to act promptly and diligently, this Court must observe that Respondent lacked credibility in his defense on this issue-this Court is not persuaded that ethics caused Respondent to refrain from filing this pleading and is likewise not persuaded that Respondent wrote Dean with his concerns.

### COMMUNICATION

"Petitioner maintains that the Respondent violated Rule 1.4(a) by failing to inform Dean that the hearing on the Motion to Dismiss/for Summary Judgement was scheduled for July 6, 2005, and thereafter, that the Motion had been denied. Petitioner also asserts that the Respondent violated Rule 1.4(b) by not explaining: (1) the terms of the fee agreement; and (2) the reason for not filing a Counterclaim.

"Petitioner has established a violation by Respondent of Rule 1.4(a) by clear and convincing evidence. Respondent correctly observes at page 11 of his Memorandum that "the Motion to Dismiss hearing did not require Dean's appearance." He then argues that because Dean did not have to appear to testify, it was unnecessary to inform him of the hearing date. The facts, however, have less to do with whether Dean was necessary as a witness than with the notion that every lawyer's client is entitled to answers to basic questions concerning the progress of litigation. On June 21, 2005, Dean sent a specific e-mail stating "The purpose of this e-mail is to find out what is the status of the Motion to Dismiss?" The Circuit Court docket entries indicate that notices of the Motion Hearing were sent to Respondent on June 20, 2005 and June 22, 2005 establishing the hearing date of July 6, 2005. Respondent responded to Dean's e-mail the same day it was sent, June 21, 2005—not by simply informing Dean of the July 6, 2005 hearing date—

but by transmitting the proposed Motion to Withdraw as Counsel.

"While Dean's appearance was not necessary at the July 6, 2005 hearing, and while the client is not necessarily required to be informed of every proceeding or development in a case, clearly, at a minimum, when a client addresses a specific inquiry to his attorney like this, he is entitled to an answer under the Communication rule. Likewise, having expressed a specific interest in the Motion to Dismiss/for Summary Judgment, Dean was entitled to have been informed that it had been denied. Respondent plainly violated Rule 1.4(a) by not keeping Dean reasonably informed about the status of the matter and by not promptly complying with a reasonable request for information.

"The Petitioner has failed to establish a Rule 1.4(b) violation by clear and convincing evidence. Dean was, at the very least, a sophisticated consumer of legal services. There was no evidence presented warranting a conclusion that he required an explanation of the terms of the Attorney–Client Fee Agreement. Moreover, since this Court has not been persuaded that the Respondent consciously examined the landscape of facts in the Wallace matter and determined to refrain from filing a Counterclaim for ethical reasons, there would not logically have been a need to have communicated with Dean about those reasons.

## *DISHONESTY, FRAUD, DECEIT AND CONDUCT PREJUDICIAL TO THE ADMINISTRATION OF JUSTICE*

"The Court does not conclude that the Respondent entered into the Attorney–Client Fee Agreement with Dean, planning or intending to later increase his flat fee for representation of the Defendants in the Baltimore City litigation from $5,000.00 to $10,000.00. Rather, this Court determines that between April 24, 2005 and May 24, 2005, the Respondent reached a conclusion that the Wallace litigation was neither a "pimple" nor a "small case," as characterized by Mr. Bell; and that a $5,000.00 flat fee was grossly

insufficient to cover his time exposure for even a minimally competent representation of the Defendants through trial. The Respondent determined to deal with this by seeking to extract from Dean an additional $5,000.00, using a pretext of a realization that there were two additional related defendants sued in the Baltimore City case who required representation. Instead of simply informing Dean that he had grossly underestimated the scope of the undertaking and asking to renegotiate the flat fee, the Respondent engaged in a ploy to increase his fee by suggesting that he did not know there were additional defendants; or that, somehow, those additional defendants were being unjustly enriched by receiving the benefit of his representation without being charged for it.

"In *Attorney Grievance Commission v. Kerpelman*, 292 Md. 228, 438 A.2d 501 (1981), the Court of Appeals concurred in a trial judge's determination that an attempt to change a fee arrangement mid-way through representation was dishonest, deceitful and prejudicial to the administration of justice. There, the trial court found that Kerpelman had undertaken the representation of a client in a family law matter, agreeing to charge a $2,000.00 retainer and $70.00 per hour for his services. During the actual trial of the underlying case, Kerpelman presented his client with a new, written "Agreement as to Fee." The client signed this new agreement under the circumstances, which basically stated that the fee could be increased based on success at trial. After trial, Kerpelman sent his client a bill for $8,500.00. He later sued the client and attempted to raise the fee to $25,000.00. With regard to the original effort to change the fee agreement, the trial judge found clear and convincing evidence that:

"Either the respondent quoted a fee based on an hourly rate of $70.00 knowing that he was not going to abide by such an agreement if the case was won or, having won the case, decided that the time was propitious to extract a larger fee than had been agreed upon. Engaging in such conduct involves dishonesty and deceit and is prejudicial

to the administration of justice and furthermore reflects on the respondent's fitness to practice law.

"The Court of Appeals concurred in that result. *Attorney Grievance Commission v. Kerpelman*, 292 Md. 228, 242, 438 A.2d 501, 509 (1981). *See also, Attorney Grievance Commission v. Milliken*, 348 Md. 486, 518, 704 A.2d 1225 (1998) (Court of Appeals upholds a finding that receipt of a fee in full and failure to perform any work whatsoever is dishonest, deceitful, fraudulent and prejudicial to the administration of justice). While Kerpelman's effort was more egregious than that of the Respondent (Kerpelman's effort to extract a higher fee having been made during the actual course of a trial), this Court believes that the Kerpelman Decision stands for the proposition that, generally, it is deceitful and dishonest for a lawyer to threaten to cease advancing or protecting his client's interests in litigation in order to renegotiate his fee agreement. This is precisely what occurred in this case.

"The conduct here should be distinguished from that of the attorney in *Attorney Grievance Commission v. McLaughlin*, 372 Md. 467, 813 A.2d 1145 (2002), where the attorney accepted a fee of $72,000.00 from four (4) clients knowing that "he had not done and 'clearly did not plan to do'" the legal work that he was hired to complete. The evidence in this case does not support a conclusion that this Respondent intended to take a flat fee of $5,000.00 and not do the work required to get the underlying litigation through trial. Rather, this Court concludes that Respondent wanted to continue to represent Dean and the related entities—he simply decided that he was entitled to a higher fee for doing so at some point after agreeing to accept a fee of $5,000.00. While he did not wait for a time in the progress of the litigation as "propitious" as the moment chose by Kerpelman, this Court is convinced, to the clear and convincing standard, that the Respondent made a deliberate choice to try to renegotiate the fee agreement in this case under threat of withdrawing and causing Dean to lose the value of the fee arrangement which he had struck with

the Respondent originally. This, under the standard established in *Kerpelman, supra,* constitutes a violation of Rules 8.4(c) and (d).

"There is no evidence that the Respondent lied to or attempted to defraud Dean—he never wrote to Dean or otherwise communicated with him to suggest that he did not know there were three (3) Defendants when he set the original fee, in his various efforts to convince Dean to pay more on and after May 31, 2005. However, he did take that position at the hearing, while under oath, and, having done so, likely violated Rule 3.3 before this Court.

*ATTORNEYS FEES*

"It is alleged in the Petition that Respondent failed to maintain an attorney trust account in violation of Maryland Rule 16–603. As indicated, because Respondent failed to disclose information about his attorney trust account in discovery, this Court ruled, before trial, that the Respondent was precluded from testifying that he had used an attorney trust account to escrow funds paid to him by Dean in the subject matter. Counsel for Respondent proffered, before commencement of the hearing, that Respondent did, indeed maintain an attorney trust account at the Chevy Chase Bank, but conceded that no portion of the $5,000.00 payment made to him by Dean was placed in that account.

"This Court is not persuaded that the Respondent failed to maintain an attorney trust account in violation of Maryland Rule 16–603. This Court has accepted and does accept counsel's proffer that the Respondent did maintain an attorney trust account at the Chevy Chase Bank. Accordingly, this Court shall proceed to determine the real questions at issue here, which are: whether the Respondent's fee may have become and unreasonable one under Rule 1.5; and, whether, reasonable or not, Respondent was required to have placed the flat fee in an attorney trust account upon receipt.

"Examining the attorney trust account question first, Rule 16–604 provides, in relevant part, that:

"[A]ll funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited to an attorney trust account in an approved financial institution. . . .

"Rule 16–609 provides that:

An attorney or law firm may not borrow or pledge any funds required by these rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer. . . .

"Rule 1.15 provides that:

A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules.

"This Court finds, by clear and convincing evidence, that Respondent violated each of these provisions in failing to deposit the $5,000.00 fee into his attorney trust account upon receiving those funds. While the Court of Appeals has not held that all "flat fees" paid for future legal work, or "advance payment fees" must, under all circumstances, be placed in an attorney trust account (*See, Attorney Grievance Commission v. Milliken,* 348 Md. 486, 517 (note 14), 704 A.2d 1225 (1998)), the Court has regularly determined, in its case-by-case examinations, that such flat fee payments must be placed in escrow upon receipt, if the work has not been performed at the time of receipt. *See, Attorney Grievance Commission v. Guida,* 391 Md. 33, 53, 891 A.2d 1085 (2006); *Attorney Grievance Commission v.Blum,* 373 Md. 275, 818 A.2d 219 (2003); *Attorney Grievance Commission v. McLaughlin,* 372 Md. 467, 813 A.2d 1145 (2002);

*Attorney Grievance Commission v. Briscoe,* 357 Md. 554, 745 A.2d 1037 (2000).

"Despite use of the words "non-refundable" and "chargeable" in the written Agreement, and the Respondent's efforts to try to explain what he meant by employing those terms, it is clear from the fourth sentence of paragraph four of the Agreement ("Any unearned portion of the $5,000.00 fee will be refunded to [sic] although, due to discounted rate you have been charged in lieu of the hourly fee of $250.00 per hour, the amount of legal time required for your case will likely exceed the amount your are [sic] required to pay out-of-pocket and this possibility is not likely under the circumstances.") and from paragraph six ("After our services conclude, we will, upon your request, deliver your file to you along with any funds . . . of yours in our possession . . . .") that a refund of these fees was contemplated if Respondent's representation was to conclude prematurely. He also testified that he understood that the payment was refundable under certain circumstances.

"Moreover, since the Agreement required the Respondent's representation "through trial in this matter," the fee would not be earned until conclusion of the trial. For all of these reasons, this Court concludes that the evidence is clear and convincing that the Respondent violated Rule 1.15 and Rules 16–604 and 16–609 in failing to place a legal fee in a trust account, and to hold it there through trial, and certainly, pending resolution of the dispute that evolved between he and Dean over a refund of the fee.

"With regard to the reasonableness of the fee charged by the Respondent in this matter, he argues that Dean was "an experienced business person" who entered into the arrangement with Respondent at arms length, and that this is proof *vel non* that the flat fee arrangement was reasonable. Moreover, there was proof that other lawyers of prominence had set fees of $10,000.00 for representation of the defense through trial.

"This Court agrees that the fee arrangement initially entered into by and between the parties was not unreasonable. However, a legal fee that is initially reasonable can

become unreasonable or excessive in cases where the attorney does little or no work. *See, Attorney Grievance Commission v. Monfried,* 368 Md. 373, 794 A.2d 92 (2002); *Attorney Grievance Commission v. Dietz,* 331 Md. 637, 629 A.2d 678 (1993). The fee can also become unreasonable when the large bulk of work to be performed under the original agreement is left unperformed at the time of withdrawal, which is what occurred here.

"Respondent did not represent Dean or any of the other entities through trial. He filed a Motion to Dismiss/for Summary Judgment and a Motion for Judicial Notice and Reply to Plaintiff's Response to Motion to Dismiss/for Summary Judgment; propounded some written discovery requests and attended a single hearing on the Motion to Dismiss before withdrawing from the case. The evidence is not clear as to whether the pleadings that the Respondent fled were, in fact, the pleadings that had been drafted by Mr. Bell (or his associate), which had been the subject of the previous $2,500.00 charge. However, even if the Respondent authored all of the pleadings and discovery requests without resort to Mr. Bell's drafts, a charge of $5,000.00 for prosecution of this unsuccessful motion is not a reasonable fee. It is clear that a more-than-reasonable $5,000.00 fee for representation through trial became an unreasonable $5,000.00 fee for filing of a single Motion and the propounding of some discovery pleadings in this case. Had the funds been maintained in the Respondent's trust account, where they belonged, perhaps a sensible and reasonable refund could have been arranged. In any event, this Court concludes that the Petitioner has established, by clear and convincing evidence, that Respondent violated Rule 1.5 in this matter, because his fee became unreasonable based on his withdrawal. His time records are confusing and contradictory and do not compel a different conclusion.

*CONCLUSION*

"The Petitioner has failed to establish violations of Rules 1.3; 1.4(b); 1.16(d) or Maryland Rule 16–603. The Petitioner has established, by clear and convincing evidence, violations of Rules 1.4(a); 1.5; 1.15; 8.4 and Maryland Rules 16–

604 and 16–609. This Court observes that much of what transpired here may be ascribed to the Respondent's relative youth and inexperience, and also to the conduct of Mr. Bell in not only failing to thoughtfully mentor a younger lawyer to whom he had referred a case, but also, perhaps, in consorting with Dean after the relationship between Dean and the Respondent soured to precipitate these charges. Ordinarily, these could be seen as mitigating factors.

"On the other hand, this Court is concerned about the Respondent's apparent lack of candor during his testimony in the hearing: his testimony that he did not know that there were three (3) defendants sued in the Baltimore City litigation before setting the fee was not credible; nor was his testimony that he could not file a Counterclaim on behalf of Dean for ethical reasons.

"There is no doubt that the Respondent has failed, and seems to continue to fail to recognize the special obligations of a lawyer in setting a fee agreement with a client, and, more importantly, in adhering to it. When courts are asked to pass upon the reasonableness of legal fees, they must apply and will continue to apply far more rigorous standards than when examining sales commissions and performance bonuses in the business marketplace, particularly in the modern legal climate, where leave to enter and withdraw appearances in litigation continues to be sought and granted virtually without restriction, and with increasing frequency. Lawyers must not be permitted to threaten to abandon clients whenever it strikes them that they are in a position to renegotiate fees. Respondent should be taught, at a minimum, that bargaining techniques, posturing and subtle intimidation, all of which he employed with Dean in an effort to increase his fee, have no place in the lawyer-client relationship, particularly after a fee agreement is consummated."

(emphasis in original) ("[sic]"s in original).

## STANDARD OF REVIEW

In proceedings involving attorney discipline, this Court has original and complete jurisdiction and conducts an inde-

pendent review of the record. *Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 564, 846 A.2d 353, 369–70 (2004); *Attorney Grievance Comm'n v. Awuah*, 374 Md. 505, 520, 823 A.2d 651, 660 (2003); *Attorney Grievance Comm'n v. Jaseb*, 364 Md. 464, 475, 773 A.2d 516, 522 (2001). In our review of the record, the hearing judge's findings of fact generally will be accepted unless they are clearly erroneous. Maryland Rule 16–759(b)(2); [12] *Attorney Grievance Comm'n v. Goff*, 399 Md. 1, 28, 922 A.2d 554, 570 (2007); *Attorney Grievance Comm'n v. Gore*, 380 Md. 455, 468, 845 A.2d 1204, 1211 (2004); *Attorney Grievance Comm'n v. Potter*, 380 Md. 128, 151, 844 A.2d 367, 380–381 (2004). As to the hearing judge's conclusions of law, such as whether provisions of the MRPC were violated, "our consideration is essentially *de novo*." Maryland Rule 16–759(b)(1); [13] *Attorney Grievance Comm'n v. Mba-Jonas*, 397 Md. 690, 700, 919 A.2d 669, 675 (2007); *Attorney Grievance Comm'n v. McLaughlin*, 372 Md. 467, 493, 813 A.2d 1145, 1160 (2002); *Mininsohn*, 380 Md. at 564, 846 A.2d at 370; *Awuah*, 374 Md. at 520, 823 A.2d at 660.

## DISCUSSION

The hearing judge found violations of MRPC 1.4(a), 1.5, 1.15, 8.4, and Rules 16–603, 16–607 and 16–609. We have reviewed the record and conclude that Judge Cahill's findings of fact are supported by clear and convincing evidence, except

---

12. Maryland Rule 16–759(b)(2) provides:
 (2) Findings of fact. (A) If no exceptions are filed. If no exceptions are filed, the Court may treat the findings of fact as established for the purpose of determining appropriate sanctions, if any.
 (B) If exceptions are filed. If exceptions are filed, the Court of Appeals shall determine whether the findings of fact have been proven by the requisite standard of proof set out in Rule 16–757(b). The Court may confine its review to the findings of fact challenged by the exceptions. The Court shall give due regard to the opportunity of the hearing judge to assess the credibility of witnesses.

13. Maryland Rule 16–759(b)(1) states:
 (b) **Review by Courts of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

for his finding that Dean paid Wallace $65,000.00 in settlement of his claims. We will discuss this below. With this one exception, we accept the hearing court's findings of fact for the purpose of determining the appropriate sanction. Both Petitioner and Respondent took exceptions to the hearing judge's findings of fact and conclusions of law, each of which we shall address.

*A. Petitioner's Exceptions to Findings of Fact and Conclusions of Law*

██ Bar Counsel ("Petitioner") took exception to Judge Cahill's finding that "Dean paid Wallace some $65,000 to resolve all claims and presumably to acquire Wallace's interest in the restaurant business" as it was not supported by any evidence in the record. As we have indicated, findings of fact made by a hearing judge are ordinarily entitled to deference unless clearly erroneous. Petitioner correctly states that it was Dean's uncontested testimony that he paid Wallace $65,000.00 at the termination of their joint venture, *prior* to the filing of Wallace's suit against Dean, not in settlement of Wallace's legal claims. The hearing judge did not cite the basis for his finding, and it appears to be merely a misunderstanding of Dean's testimony. We therefore conclude that the hearing court's interpretation represents clear error and we sustain Petitioner's exception.

██ Bar Counsel also took exception to the hearing court's failure to find that MRPC 1.16(d) was violated by Respondent's failure to refund the unearned portion of the $5,000.00 prepaid fee. Petitioner argues that the findings which were the basis for Judge Cahill's conclusion that the prepaid fee was unreasonable in violation of MRPC 1.5 also provide clear and convincing evidence that MRPC 1.16(d) was violated. Rule 1.16(d) states in pertinent part:

(d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, sur-

rendering papers and property to which the client is entitled and refunding any advance payment of fee or expense that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

In drawing his conclusion that Respondent had not violated 1.16(d), the hearing judge focused on whether Respondent violated the rule by failing to hand over his office files to Mr. Malone, the attorney who succeeded him in representing Dean and the other two defendants in Wallace's suit: Wallace and Dean Incorporated and T.D. Bistro, Inc. The hearing judge was correct in concluding that Respondent's failure to turn over his files prior to August 11, 2005, the date on which the Circuit Court for Baltimore City docketed the order allowing Respondent to withdraw from his representation, did not establish by clear and convincing evidence a violation of MRPC 1.16(d). The hearing court, however, neglected to consider whether Respondent's failure to return part or all of the $5,000.00 retainer violated the rule.

We have held that MRPC 1.16(d) can be violated when an attorney fails to protect his client's interests by refusing to refund unearned fees or by failing to return such fees in a timely fashion. *See Attorney Grievance Comm'n v. Cherry–Mahoi*, 388 Md. 124, 157, 879 A.2d 58, 79 (2005); *Attorney Grievance Comm'n v. Milliken*, 348 Md. 486, 517, 704 A.2d 1225, 1240 (1998). In the present case, the hearing court found that Respondent's claim to the $5,000.00 retainer represented an unreasonable fee and that his testimony that he had properly earned these funds was not credible. Respondent failed to return to Dean any portion of the $5,000.00 flat fee, and so violated MRPC 1.16(d). We therefore sustain Bar Counsel's exception.

*B. Respondent's Exceptions to Findings of Fact and Conclusions of Law*

Respondent took exception to the hearing judge's finding that he knowingly agreed to represent all three defendants in the Wallace suit, arguing that as only Dean signed the April

24, 2005 written fee agreement, Respondent was only obligated to represent Dean, regardless of his knowledge of the other co-defendants. We overrule Respondent's exception.

Judge Cahill's finding that Respondent knew that there were three defendants who had been sued in the Baltimore City litigation and that he was to represent all three was clearly supported by the record. While it is true that the record reflects that Dean alone signed the fee agreement, it also is true that other evidence in the record substantiates a finding that Respondent undertook and continuously represented all three defendants. Jimmy A. Bell, the lawyer who referred this matter to Respondent, testified that Respondent knew that there were three defendants to be represented in the action prior to April 24, 2005. Also, on April 22, 2005, Respondent sent a letter to Dean which specifically discussed that three parties were named as defendants for which Respondent subsequently entered his appearance. Additionally, on May 23, 2005, Respondent emailed Dean and stated that "I do want to continue to represent T.D. Bistro, Inc./Timothy Dean Bistro. As you know, I will vigorously represent all Defendants in the interim. Please do not retain separate counsel without first discussing it with me and seeking my input." Mr. Bell's testimony and the actions of the Respondent which occurred both before and after the April 24, 2005 execution of the fee agreement are the underpinnings for Judge Cahill's findings that Respondent both knew about and intended to represent all three defendants despite the conflict with the fee agreement. We therefore overrule Respondent's exception.

Respondent also took exception to a number of Judge Cahill's conclusions of law. Specifically, he took exception to the hearing judge's conclusions that he violated MRPC 8.4(c) and (d), 1.4(a), and 1.15. We overrule these exceptions.

Respondent excepted to Judge Cahill's conclusion that he violated MRPC 8.4(c) and (d), arguing that the evidence did not support his findings. Rule 8.4, sections (c) and (d) state in relevant part that

[i]t is professional misconduct for a lawyer to:

\* \* \*

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice....

While the hearing judge did not conclude that Respondent entered into the Attorney–Client Fee Agreement with Dean with the intent to later increase his flat fee from $5,000.00 to $10,000.00, he did find that Respondent improperly sought to renegotiate his fee in the midst of representation with threats of withdrawal of representation. Judge Cahill compared the present case to *Attorney Grievance Comm'n v. Kerpelman,* 292 Md. 228, 438 A.2d 501 (1981), in which this Court concurred with the hearing court's conclusion that an attempt to alter a fee arrangement mid-way through representation through coercion "involves dishonesty and deceit and is prejudicial to the administration of justice...." *Id.* at 242, 438 A.2d at 508.

Judge Cahill correctly noted that Kerpelman's presentation to his client of a new fee agreement during trial represents more egregious conduct than occurred here, but he also recognized that *Kerpelman* "stands for the proposition that ... it is deceitful and dishonest for a lawyer to threaten to cease advancing or protecting his client's interests in litigation in order to renegotiate his fee agreement." Respondent, like Kerpelman, improperly threatened withdrawal from representation in attempting to renegotiate his fee with Dean—clearly a coercive and intimidating act. Respondent, unlike Kerpelman, was not found credible when he testified before the hearing judge concerning his reasons for seeking the increased fee.

Respondent improperly attempted to renegotiate his fee after commencing representation of his client and then later misrepresented his motives for doing so during the hearing before Judge Cahill. These actions involved dishonesty and

deceit and were prejudicial to the administration of justice. We therefore find that there is clear and convincing evidence that Respondent's actions in renegotiating his fee under threat of withdrawal and misrepresenting his motives before the hearing court violated MRPC 8.4(c) and 8.4(d), and we over-rule Respondent's exceptions.

Respondent also took exception to the hearing judge's finding that he violated MRPC 1.4(a), asserting that his con-clusion was "totally wrong." Judge Cahill found that Respon-dent violated MRPC 1.4(a) by failing to respond to his client's direct questions concerning the Motion to Dismiss filed in the Circuit Court for Baltimore City. Rule 1.4(a) states that

(a) A lawyer shall:

(1) promptly inform the client of any decision or circum-stance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for informa-tion; and

(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

On June 21, 2005, Dean sent an email specifically stating "[t]he purpose of this e-mail is to find out what is the status of the Motion to Dismiss?" Respondent's reply to this email was not to inform his client of the hearing scheduled for July 6, 2005 but to transmit his proposed Motion to Withdraw as Counsel. While Respondent is correct in stating that Dean's appearance at the July 6, 2005 hearing was not necessary, Dean was still entitled to a timely response to his specific question. Additionally, after having expressed concern over the status of the Motion to Dismiss, Dean should have been informed when the motion was denied, which Respondent did not do.

We have held that failure to keep a client reasonably informed about the progress of his representation is a violation of MRPC 1.4(a). *See Attorney Grievance Comm'n v. Lee*, 390 Md. 517, 525–26, 890 A.2d 273, 277–78 (2006); *McLaughlin*, 372 Md. at 501, 813 A.2d at 1165. The hearing court found that Respondent neglected to respond to his client's question about the date of the hearing on his Motion to Dismiss in a timely manner and likewise never informed Dean of the outcome of that hearing. Respondent argues that this was error as Dean admitted to some uncertainty in his memories of specific communications with Respondent. Judge Cahill found credible Dean's testimony that he had concerns about Respondent's representation and did not feel that Respondent addressed to those concerns appropriately. Respondent presents no evidence or specific arguments to support his contention that the hearing judge's finding was clearly erroneous. We therefore find that Respondent did violate MRPC 1.4(a) by failing to keep his client reasonably informed about the status of the Motion to Dismiss, especially when the client directly requested specific information.

 Respondent also took exception to Judge Cahill's conclusion that he violated 1.15, arguing that there was clear and convincing evidence that he had earned his $5,000.00 flat fee. Rule 1.15 provides in relevant part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property.

Respondent argues that he did not violate MRPC 1.15 because he had already earned the fee when he received it from Dean as it was "non-refundable" and "chargeable." Judge Cahill properly incorporated in his decision our holdings that fee payments, such as the one provided to Respondent by Dean, must be placed in escrow upon receipt, if the work had not yet been performed at that time. *See Attorney Grievance Comm'n v. Guida*, 391 Md. 33, 53, 891 A.2d 1085, 1097 (2006); *Attorney Grievance Comm'n v. Blum*, 373 Md. 275, 297–298,

818 A.2d 219, 232–233 (2003); *McLaughlin,* 372 Md. at 504, 813 A.2d at 1167.

We also agree with the hearing court's analysis that in the Fee Agreement itself, the $5,000.00 fee was contemplated to be refundable, particularly if Respondent's representation were to conclude prematurely, as in fact happened. Likewise, as the Agreement stated that the fee was in exchange for Respondent's representation "through trial in this matter," it was envisioned in this case that the fee would remain unearned until the end of the trial. We, therefore, concur with the hearing judge and conclude that there is clear and convincing evidence that the fee was not earned at the time that Respondent received it from Dean and failed to properly place it in his attorney trust account. Accordingly, we conclude that Respondent violated MRPC 1.15 and overrule Respondent's exception.

## C. Conclusions of Law

The hearing judge determined that Respondent acted in violation of MRPC 1.5 when he agreed to represent Dean through trial for $5,000.00, failed to complete the representation by withdrawing prior to trial, and then refused to refund any of the $5,000.00 fee. Rule 1.5 provides in pertinent part:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses.

\* \* \*

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

Judge Cahill noted that while the $5,000.00 fee may have been reasonable at the time it was negotiated, it became an unreasonable fee when the Respondent withdrew his representation prior to trial, leaving unperformed much of the work originally contemplated when the parties entered into the Agreement. Additionally, the record is unclear as to the amount of work that Respondent did prior to his withdrawal, particularly given Mr. Bell's testimony that he prepared drafts of the pleadings and provided them to the Respondent. The hearing court found that even if Respondent made no use of the drafts, however, $5,000.00 remained an unreasonable fee for the filing of a single motion and the propounding of some discovery pleadings.

This Court has held that an initially reasonable fee, even a flat fee, may become excessive in cases where the attorney does little or no work. *See Guida,* 391 Md. 33, 53–53, 891 A.2d 1085, 1096–97; *Attorney Grievance Comm'n v. Monfried,* 368 Md. 373, 392–93, 794 A.2d 92, 103 (2002); *Attorney Grievance Comm'n v. Dietz,* 331 Md. 637, 647, 629 A.2d 678, 683 (1993). Given that Respondent withdrew his representation before the matter had proceeded through trial, and in light of his failing to establish by a preponderance of the evidence that the amount of work he performed justified the fee, we find that Respondent violated Rule 1.5 by charging a fee that was unreasonable under the circumstances.

■ The hearing judge also found that Respondent violated Maryland Rules 16–604 and 16–609 by failing to deposit the prepaid unearned $5,000.00 fee into an attorney trust account. In failing to place the fee into the proper account, Respondent also failed to hold any portion of the fee in trust until it was earned by representation through trial and neglected to hold the funds in trust pending resolution between himself and Dean over refund of the fee. Maryland Rule 16–604 states in relevant part:

Except as otherwise permitted by rule or other law, all funds, including cash, received and accepted by an attorney or law firm in this State from a client or third person to be

delivered in whole or in part to a client or third person, unless received as payment of fees owed the attorney by the client or in reimbursement for expenses properly advanced on behalf of the client, shall be deposited in an attorney trust account in an approved financial institution.

Maryland Rule 16–609 states:

An attorney or law firm may not borrow or pledge any funds required by these Rules to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose. An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer.

Before commencement of the January 31, 2007 hearing before Judge Cahill, counsel for Respondent proffered that while Respondent did maintain an attorney trust account, no portion of the $5,000.00 payment he obtained from Dean was ever placed in that account. The hearing court accepted this proffer and therefore found by clear and convincing evidence that Respondent violated Maryland Rules 16–604 and 16–609 by failing to place unearned attorney fees in his attorney trust account. Having already dispensed with Respondent's argument that the fee was earned at the time it was deposited in our discussion of MRPC 1.15 *ante*, we agree with the hearing court and conclude that there is clear and convincing evidence that the $5,000.00 was not earned at the time that Respondent failed to place it in his attorney trust account and that he thereby violated Rules 16–604 and 16–609.

## SANCTION

In the case sub judice, Respondent has violated MRPC 1.4(a), 1.5, 1.15, 1.16(d), 8.4(c) and (d), and Maryland Rules 16–604 and 16–609. Petitioner has recommended a sanction of disbarment, arguing that Respondent's engagement in dishonest and deceitful conduct in violation of MRPC 8.4(c) compels imposition of the sanction of disbarment, absent compelling extenuating circumstances. Respondent suggests that a public reprimand is the appropriate sanction and urges us to

consider the hearing court's findings that the events that are the subject of this inquiry "may be ascribed to the Respondent's relative youth and inexperience, and also to the conduct of Mr. Bell."

██ The appropriate sanction for a violation of the Rules of Professional Conduct generally "depends on the facts and circumstances of each case, including consideration of any mitigating factors," *Attorney Grievance Comm'n v. Zuckerman*, 386 Md. 341, 375, 872 A.2d at 693, 713 (2005), in furtherance of the purposes of attorney discipline: " 'to protect the public, to deter other lawyers from engaging in violations of the Maryland Rules of Professional Conduct, and to maintain the integrity of the legal profession.' " *Id.*, quoting *Awuah*, 374 Md. at 526, 823 A.2d at 663. In *Attorney Grievance Comm'n v. Sheridan*, 357 Md. 1, 741 A.2d 1143 (1999), we said:

> Because "an attorney's character *must remain beyond reproach* " this "Court has the duty, since attorneys are its officers, to insist upon the *maintenance* of the integrity of the bar and to prevent the transgressions of an individual lawyer from bringing its image into disrepute. Disciplinary proceedings have been established for this purpose, not for punishment, but rather as a catharsis for the profession and a prophylactic for the public."

*Id.* at 27, 741 A.2d. at 1157, quoting *Attorney Grievance Comm'n v. Deutsch*, 294 Md. 353, 368–69, 450 A.2d 1265, 1273 (1982) (emphasis in original). When imposing sanctions, we have enunciated that, " '[t]he public is protected when sanctions are imposed that are commensurate with the nature and gravity of the violations and the intent with which they were committed.' " *Gore*, 380 Md. at 472, 845 A.2d at 1213. Therefore, in this case we consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances. *Attorney Grievance Comm'n v. Sweitzer*, 395 Md. 586, 598–99, 911 A.2d 440, 447–48 (2006).

We have looked at the aggravating factors found in 9.22 of the American Bar Association Standards for Imposing Lawyer

Sanctions (1991). *See Mininsohn,* 380 Md. at 575, 846 A.2d at 376. These include:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceeding by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

*Id.* Several of these factors are present in this case, specifically (f), (g), and (i). This Court shares Judge Cahill's grave concerns about Respondent's lack of remorse and failure to recognize his obligations in setting a fee arrangement with a client. Respondent has not returned unearned fees to his client and has not demonstrated contrition. Respondent's lack of comprehension of the responsibilities peculiar to the legal profession gives us pause. We therefore agree with Judge Cahill that

Respondent should be taught, at a minimum, that bargaining techniques, posturing and subtle intimidation, all of which he employed with Dean in an effort to increase his fee, have no place in the lawyer-client relationship, particularly after a fee agreement is consummated.

The facts in the current case are very similar to those in *Kerpelman,* 292 Md. at 228, 438 A.2d at 501. In *Kerpelman,* we considered what sanction was appropriate for an attorney who renegotiated his fee in the midst of representation under the threat of withdrawal in violation of Maryland Disciplinary Rules 1–102(A)(4) and (5), the predecessors to MRPC 8.4(c) and (d), as well as Disciplinary Rule 2–106(A),

the predecessor to MRPC 1.5. While we found that Kerpelman's conduct "involve[d] dishonesty and deceit and [was] prejudicial to the administration of justice" we did not find that his actions involved the type of deceit that merited disbarment. *Id.* at 242, 438 A.2d at 508. Instead, we found that Kerpelman's actions represented an isolated incident and that the proper sanction was suspension from the practice of law for a period of one year. *Id.* at 244–45, 438 A.2d at 509–10.

In addition, one case of more recent vintage also involved an attorney attempting to renegotiate or raise fees subsequent to the commencement of representation while threatening withdrawal, and is therefore instructive in determining the sanction in the present case. In *Attorney Grievance Comm'n v. Korotki*, 318 Md. 646, 569 A.2d 1224 (1990), an attorney was found to have violated Disciplinary Rule 2–106, the precursor to MRPC 1.5, and Disciplinary Rule 5–103(A), the predecessor to MRPC 1.8(h)(2)(i), by demanding that his clients sign amended fee agreements at two crucial points in the proceedings, lest he cease to represent them. After successfully litigating his client's claims at the trial level under a contingency fee agreement by which he was entitled to forty percent of their award, Korotki sought to force his clients to sign a new agreement under which he would be entitled to a total of sixty percent of all monies collected. Korotki told his clients that if they did not agree to the increase he would no longer represent them. Subsequent to the Court of Special Appeals rendering a decision in favor of Korotki's clients, he once more requested that they sign a revised fee agreement which raised his contingency fee to seventy-five percent. Again, he threatened to withdraw unless his clients signed the new agreement. In deciding the proper sanction for Korotki's behavior, this court analogized to *Kerpelman*, as Korotki's actions also involved fee gouging which harmed the public's perception of the legal profession. As the fees charged by Korotki were significantly higher than those charged by Kerpelman, this Court felt that a harsher sanction was warranted, suspending Korotki for eighteen months. *Id.* at 671–72, 569 A.2d at 1237.

Like the attorneys in *Kerpelman* and *Korotki,* Respondent sought to increase his fees once he had begun representation of his client's interests under the umbrella of withdrawal. Respondent's actions can be said to be less egregious than those of the attorneys in the earlier two cases in that he did not wait until a crucial point in the proceedings to renegotiate his fees (as occurred in *Kerpelman* and *Korotki* ), and the fees associated in the present case were less expansive compared with those in *Kerpelman* ($25,000) and *Korotki* ($471,424.36). The Respondent's actions, however, compare unfavorably with those of these attorneys in that he not only violated MRPC 8.4(c) and (d) by attempting to renegotiate his fees while threatening to withdraw, but also by misrepresenting his reasons for doing so before the hearing court.

 In determining the appropriate sanction, we also consider any mitigating factors. These include:

absence of a prior disciplinary record; absence of a dishonest or selfish motive; personal or emotional problems; timely good faith efforts to make restitution or to rectify consequences of misconduct; full and free disclosure to disciplinary board or cooperative attitude toward proceedings; inexperience in the practice of law; character or reputation; physical or mental disability or impairment; delay in disciplinary proceedings; interim rehabilitation; imposition of other penalties or sanctions; remorse; and finally, remoteness of prior offenses.

*Attorney Grievance Comm'n v. Floyd,* 400 Md. 236, 258–59, 929 A.2d 61, 74 (2007); *Sweitzer,* 395 Md. at 599, 911 A.2d at 448, quoting *Attorney Grievance Comm'n v. Glenn,* 341 Md. 448, 488–89, 671 A.2d 463, 483 (1996). Looking to these factors, Respondent's relative youth and inexperience are considered in choosing the appropriate sanction. *See Attorney Grievance Comm'n v. Obi,* 393 Md. 643, 660, 904 A.2d 422, 432 (2006). Respondent also has no prior disciplinary record, and the instant violations are not part of pattern of conduct.

After analyzing analogous cases and considering all of the mitigating and aggravating circumstances, including both Re-

spondent's relative youth and inexperience and his lack of remorse and apprehension of the wrongness of his actions, we determine that Respondent's deceitful and dishonesty conduct warrants an indefinite suspension from the practice of law with the right to reapply for admission after one year.

**IT IS SO ORDERED;RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION.**